SWISS OIL CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 60177, 61002, 63088, 70998. Promulgated June 14, 1935.

*John E. McClure, Esq.*, and *R. N. Miller, Esq.*, for the petitioner.
*H. A. Cox, Esq.*, for the respondent.

## OPINION.

MURDOCK: The affirmative issue raised by the Commissioner will be discussed first. The parties have vigorously contested this point in able and extensive briefs. Section 201(c) of the Revenue Act of 1926 provides that " amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for

the stock " and " the gain or loss to the distributee resulting from such exchange shall be determined under section 202, but shall be recognized only to the extent provided in section 203." None of the exceptions contained in section 203 applies. The general rule of section 203 (a) is that the entire amount of the gain determined under section 202 shall be recognized. That gain is the excess of the amount realized from the exchange of the stock over the cost of the stock. The amount realized is the fair market value of the property received. Sec. 202 (a) and (c). Thus, if the petitioner bought the Union stock and paid no more than $5,000,000 for it, it realized a taxable gain of $2,906,043.32 in 1926 from the liquidation of Union.

The Commissioner has the burden of proving that the petitioner realized a gain in 1926 from the liquidation of Union which should be included in the petitioner's income for 1926. The petitioner became the sole stockholder of Union and received in liquidation of Union the assets of that corporation subject to its liabilities. The parties have stipulated that the value of the net amount of property received in the distribution was $7,906,043.32. The Commissioner contends that the excess of this amount over the cost of the Union stock to the petitioner was taxable gain for 1926. He concedes that the cost of the stock was $5,000,000,[1] but claims that it was no more than that amount. He therefore subtracts the cost of $5,000,000 from the amount realized, $7,906,043.32, to show a gain of $2,906,-043.32. He has fully sustained the burden of proof on this issue.

The petitioner has advanced a number of arguments in opposition to the tax. First it contends that the purchase of the stock and the liquidation of Union must be disregarded for tax purposes because they were but parts of a single transaction which had for its purpose the acquisition of the assets of Union. It argues that its intention to acquire the properties of Union is shown by the following facts, among others: It needed new properties to make its business profitable; the old stockholders of Union were allowed to take out a substantial amount of the assets of Union which were not desired by the petitioner; and the petitioner dissolved Union and took over its assets at the earliest possible date under the contract to purchase. It relies very strongly upon the case of *Prairie Oil & Gas Co.* v. *Motter*, 66 Fed. (2d) 309. The collector was there contending that the properties were acquired in connection with a reorganization and Prairie was not entitled to a stepped-up basis for depletion of cost to it, but had to take the same basis as applied to Olean. See also

---

[1] The $2,500,000 of notes which Union issued was no part of the cost of the Union stock to the petitioner, but this fact is immaterial here since the Commissioner concedes that the cost was $5,000,000 and since the petitioner assumed payment of the notes and eventually paid them.

*Warner Co.*, 26 B. T. A. 1225. Here neither party is contending that there was a reorganization and it is clear that there was none. Cf. *Pinellas Ice & Cold Storage Co.* v. *Commissioner*, 287 U. S. 462. The contract in the *Prairie* case was between Prairie, as buyer, and Olean and its stockholders, as sellers. The purchase price was paid to agents of the selling corporation and its stockholders. The contract there recited that its purpose was to transfer the leases owned by Olean for cash. Delivery of the physical properties was to be made as of a date five days before the contract was signed. Alternative methods of effecting the transfer of the physical properties were provided for—one by the transfer of the properties themselves, the other by a transfer of the corporate stock within 25 days. For reasons not disclosed by the record, the sellers transferred the stock of Olean. That corporation then made a formal transfer of its properties to Prairie, and on the same day dissolved. The question in that case was not the amount of gain or loss upon the liquidation of Olean, but was whether Prairie was entitled to depletion deductions based upon the amount it had paid out. The court held that it was entitled to such depletion deductions. In deciding that there was no reorganization to deprive Prairie of this basis, the court said that the acquisition of the properties by Prairie should be treated as an entire transaction, citing *Warner Co.*, 26 B. T. A. 1225.

There are substantial reasons in the present case why the separate transactions should not be disregarded for tax purpose and why the whole chain of events should not be regarded as a single transaction entered into for the purpose of acquiring certain properties of Union. Cf. *E. F. Simms*, 28 B. T. A. 988, 1013, *et seq.; William H. Mullins*, 14 B. T. A. 426. Although courts have a tendency at times to " look through form to substance ", they nevertheless have laid down the rule that tax liability must be determined by considering what the taxpayer did, not what it intended to do, or what it might have done. *Weiss* v. *Stearn*, 265 U. S. 242; *United States* v. *Phellis*, 257 U. S. 156; *Clemmons* v. *Commissioner*, 54 Fed. (2d) 209; *Pugh Co.* v. *Helvering*, 70 Fed. (2d) 776. Combs was originally authorized to negotiate for the purchase of either the assets or the stock of Union, but the contract which he actually entered into was with the stockholders of Union and provided for the purchase of the stock. The Union corporation, the owner of the assets, was not a party to and had nothing to do with the negotiations. It neither sold nor received anything. Cf. *United States* v. *Board*, 14 Fed. (2d) 459; *E. H. Nielsen Co.*, 26 B. T. A. 223; *W. H. Reisner Manufacturing Co.*, 13 B. T. A. 841. The parties to this proceeding are agreed that the petitioner became the owner of the stock of Union on February 2, 1925. Dissolution of Union was not contemplated at that time. It was to continue for some indefinite

time, at least until the amounts called for under the contract were paid from its earnings. Thereafter it was to mortgage its properties and deliver its notes to its old stockholders. It actually continued to hold and operate its properties for almost a year after February 2, 1925, and at the end of that time mortgaged its properties. In the meantime, the petitioner, as sole stockholder, received all dividends and benefits from the earnings of the corporation. If the petitioner was not the owner of the stock during that period, then it was not entitled to the dividends amounting to more than a million dollars which were declared during that period and transferred to the sellers of the Union stock and, consequently, that million dollars could not be a part of the cost of the stock to the petitioner. Union was a separate taxpayer during all of 1925 and joined with the petitioner in a consolidated return for a part of that year because the petitioner was the owner of all of its stock. After the petitioner had paid for the stock in full, it dissolved Union and for the first time took over the properties. The facts in the present case serve to distinguish it from the *Prairie* and *Warner* cases cited by the petitioner on this point. It is more like *W. S. Dudley*, 15 B. T. A. 570. The petitioner purchased the stock of Union and acquired the assets in the dissolution of Union. Those facts can not be disregarded for tax purposes. The distribution in liquidation was a taxable transaction. Cf. *Vonnegut Hardware Co.*, 28 B. T. A. 784; *Simms Petroleum Co.*, 28 B. T. A. 1107, 1127; affd., 74 Fed. (2d) 561; *Dolomite, Inc.*, 28 B. T. A. 1271.

The petitioner's next argument is that the cost of the Union stock was equal to the amount received in liquidation of Union and, therefore, it had no profit from these transactions, even if its purchase of the stock and the liquidation of Union may not be disregarded for tax purposes. The parties have stipulated that the value of the Union stock on February 2, 1925, was $7,906,043.32. The petitioner states that it acquired assets worth $9,656,043.32 (Union stock and $1,750,-000 in cash) and paid therefor $5,000,000 under the contract and $4,000,000 par value of its notes and stock to Pynchon & Co.[2] It therefore argues that "$2,000,000 par value of the Swiss Oil stock must be regarded as having been issued for $2,906,043.32 value of Union Gas & Oil Company stock" and the total cost of the Union stock to it was $7,906,043.32.

There are several different reasons why this argument is unsound. It is based, in part at least, upon the false premise that the cost of property obtained by the issuance of stock is the value of the property obtained, rather than the value of the stock paid for it. Where a corporation acquires property by issuing its stock for the property, the cost of the property is the fair market value of the stock. The

---

[2] The "cost", according to the petitioner's figures, was $250,000 more than the value of the assets received.

important thing is to determine the value of the stock paid for the property. *Hershey Manufacturing Co.*, 14 B. T. A. 867, 872; affd., 43 Fed. (2d) 298. Where a corporation having no assets and no liabilities issues all of its stock for property and there is no better way of determining the value of the stock, that value is sometimes determined by assuming that the total value of the stock is the equivalent of the total value of the property back of it. *Simms Oil Co.* v. *Commissioner*, 74 Fed. (2d) 561; *Ida I. McKinney*, 32 B. T. A. 450; *Pierce Oil Co.*, 32 B. T. A. 403 (part V) ; *Holmby Corporation*, 28 B. T. A. 1092; *Ambassador Petroleum Co.*, 28 B. T. A. 868; *Fifth Street Building*, 24 B. T. A. 876; *Reliance Investment Co.*, 22 B. T. A. 1287; *Mead Realty Co.*, 21 B. T. A. 1062; *Bay City Fuel Co.*, 20 B. T. A. 450; *L. H. Philo Corporation*, 16 B. T. A. 130; *Realty Sales Co.*, 10 B. T. A. 1217. Cf. *MacCallum Gauge Co.*, 32 B. T. A. 544; *Commissioner* v. *Swenson*, 56 Fed. (2d) 544; *Patterson* v. *Commissioner*, 42 Fed. (2d) 148. Under such circumstances the value of the property purchased is taken as evidence of the value of the stock paid for it. But where a corporation, having assets, liabilities, and outstanding stock, issues some new stock in exchange for some property, the situation is very different and there is much less reason to apply the above rule. *Pierce Oil Co.*, *supra.*

The sellers of the Union stock received only $5,000,000 for their stock. If the cost of the stock to the petitioner exceeded that amount, the additional cost must result from the payments to Pynchon & Co. The petitioner is contending that it acquired the contract for purchase of the Union stock from Pynchon & Co., together with $1,750,000 in cash, for which it paid Pynchon & Co. $4,906,-043.32, represented by $2,000,000 par value of its notes and $2,000,000 par value of its common stock. Ordinarily the cost of property purchased with cash is the amount of cash paid for it. Although the cost of a contract to purchase may form a part of the cost of the property purchased under that contract, still the cost of obtaining cash can not be added to the cost of property purchased with the cash in a separate transaction. Therefore, it becomes important to determine, first, whether or not the petitioner obtained the contract to purchase the Union stock from Pynchon & Co., and, if it did, second, to determine how much it paid Pynchon & Co. for that contract.

The Commissioner is contending that the petitioner did not acquire the contract to purchase the Union stock from Pynchon & Co. under the agreement of January 26, 1925, because the contract of July 29, 1924, had never been assigned to Pynchon & Co. but still belonged to the petitioner on January 26, 1925. There is evidence tending to support this contention of the Commissioner, yet the

record as a whole does not justify a definite finding of fact that the contract was not transferred from Pynchon & Co. to the petitioner. On the other hand, it does not justify a finding that it was so transferred. The consequences, if any, of this uncertainty must be suffered by the Commissioner, who has the burden of proof on this issue. However, the point is immaterial for the record shows that even if the contract was transferred by Pynchon & Co. to the petitioner, the petitioner paid nothing for it.

The fact that the petitioner paid nothing for the contract to purchase the Union stock is demonstrated by a " before and after " comparison. Prior to the transaction with Pynchon & Co. the petitioner was the owner of an option to purchase the Union stock, it needed cash with which to purchase the Union stock, and it had the inherent power to issue its notes and stock. Pynchon & Co., at that time, had $1,750,000 but had no desire to acquire the option for itself. After the transaction, the petitioner had a right to purchase the Union stock under the contract of July 29, 1924, just as it had prior to that transaction. It had obtained $1,750,000 in cash and had parted with $2,000,000 par value of its notes and $2,000,000 par value of its stock. Pynchon & Co. had parted with $1,750,000 in cash, and had obtained $2,000,000 par value of the petitioner's notes and $2,000,000 par value of the petitioner's stock.

The fact that the petitioner paid nothing for the contract is also demonstrated by consideration of the motives and acts of the parties. After Martin had stated that his company might be willing to furnish $1,750,000 in cash in exchange for $2,000,000 par value of the petitioner's notes and $2,000,000 par value of the petitioner's common stock, the general counsel of the petitioner suggested for the first time the plan of having the option exercised on behalf of Pynchon & Co. and then having the latter transfer the contract to purchase the stock to the petitioner, together with the cash. His thought was that in this way it might appear that the petitioner had received something of value over and above the $1,750,000 in cash for its notes and stock and there would be no violation of the laws of Kentucky. The Circuit Court of Appeals for the Sixth Circuit was of the opinion that the transfer over and back was an unnecessary gesture which added nothing to the validity of the stock issuance. *Lamprecht* v. *Swiss Oil Corporation*, 32 Fed. (2d) 646.[3] It certainly had no effect upon the real consideration passing

---

[3] In that case the court affirmed the decision of the lower court dismissing a bill in equity by one of the old stockholders of the petitioner for cancellation of the notes and stock issued to Pynchon & Co. The court held that the transaction with Pynchon & Co. was for the best interests of the petitioner and its stockholders because the petitioner was thereby permitted to buy the valuable Union stock at a bargain price and the stockholders were benefitted rather than wronged. The question there before the court was a very different one from the question here.

between the parties. The petitioner had a valuable option on which it had paid $75,000. Pynchon & Co. never paid the petitioner anything for the option and was not to acquire any valuable rights under the contract of July 29, 1924. The parties at all times intended that only the petitioner should benefit from the contract and only the petitioner should purchase the Union stock. Cf. *Frank J. Vlchek*, 7 B. T. A. 1244. If the contract of July 29, 1924, ever passed to Pynchon & Co., it passed without consideration and subject to an obligation to return it immediately with $1,750,000 in cash so that the petitioner could complete the initial payment. If the contract to purchase passed back to the petitioner, it likewise passed without consideration and in accordance with a prearranged plan. Those transfers were not intended to have and did not have any effect upon the amount of cash or consideration which Pynchon & Co. was to furnish the petitioner nor upon the amount of securities which the petitioner was to issue to Pynchon & Co. Thus in no true sense was a transfer of the contract to purchase the Union stock a part of the consideration moving from Pynchon & Co. to the petitioner for the issuance by the petitioner of its notes and stock and no part of the consideration paid by the petitioner was paid for a transfer of the contract to purchase the Union stock.

The fact that the petitioner paid nothing for the contract is also shown in another way. Assume that the contract passed to the petitioner from Pynchon & Co. in the same transaction in which the petitioner obtained $1,750,000 in cash from Pynchon & Co. The cost of the property thus obtained was paid in the petitioner's notes and stock, and was measured by the fair market value of those securities. Clearly $1,750,000 in cash should cost $1,750,000. Any additional cost attributable to the cost of the contract would have to be based upon an excess of the fair market value of the securities over $1,750,000. The petitioner, reasoning in this way, contends that the notes were worth par, the stock was worth $2,906,043.32, and the excess of their total value over the amount of cash obtained represents cost of the contract. The evidence in the case shows, however, that the total fair market value of the $2,000,000 par value of notes and $2,000,000 par value of stock issued to Pynchon & Co. was not more than $1,750,000 at the time of issuance. The finding of fact that the fair market value of the notes and stock issued to Pynchon & Co. was $1,750,000 at the time of issuance is fatal to the petitioner's contention that the cost of the Union stock was more than $5,000,000. The $2,000,000 par value of common stock not only was not worth $2,906,043.32, but in fact was worth only a small percentage of its par value at that time. The principal value of the securities issued to Pynchon & Co. was in the bonds. Yet they were not worth par

even when an equal amount of the par value of the stock accompanied them as a bonus. If the petitioner had obtained the $1,750,000 in cash by selling its securities to the public at fair market value, nothing would have been added thereby to the cost of the Union stock. Consequently it is not surprising that the effect of the sale of these securities to a banker was no different. Thus on no theory that has been suggested could the transaction which the petitioner had with Pynchon & Co. have had any effect upon the cost of the Union stock to the petitioner.

Another argument advanced by the petitioner is that the Commissioner is now estopped to deny that the stock and bonds issued to Pynchon & Co. were a part of the cost of acquiring the stock of Union. Its reason is that the Commissioner did not allow the petitioner a deduction for amortization of the discount on the notes for the year 1925, but stated at that time that the stock and the alleged discount should be capitalized as a part of the cost of the Union stock. An estoppel must be pleaded and proven by the party relying upon it. It is based upon the misrepresentation or concealment of some material fact. The effect of an estoppel is that the fact is conclusively presumed to be as the innocent party believed it to be. *Tide Water Oil Co.*, 29 B. T. A. 1208. The facts in this case do not establish any estoppel. The petitioner had full knowledge of the facts of its own case in 1925. If it failed to have its tax liability for 1925 correctly determined, that is not a sufficient reason for having the 1925 error corrected by an erroneous determination of its tax liability for some later year or years. Cf. *Boyne City Lumber Co.*, 7 B. T. A. 36, 50; *Basil Robillard, Executor*, 20 B. T. A. 685, 689; affd., 50 Fed. (2d) 1083; certiorari denied, 284 U. S. 650; *Seeley* v. *Helvering*, 77 Fed. (2d) 323. The petitioner also argues that there is no proof that a profit of $2,906,043.32 from the liquidation of Union has not been included in its income in the determination of the deficiency, and, further, that the prayer in the amended answer does not assert a claim for an increased deficiency as contemplated by the statute. These two arguments are mentioned merely for the purpose of indicating that they have not been overlooked. They are refuted by the facts in the case.

The only suggestion of a reason why the petitioner would not be entitled to have its deductions for depletion computed upon the stipulated value of the properties at the time it received them in the liquidation of Union, comes from its own contention that in reality it bought the assets of Union. If it did buy them, it paid no more than $5,000,-000 for them and would not be entitled to depletion deductions based upon any larger figure. However, the contention that it purchased the assets of Union has been rejected, and since it has been taxed with a profit represented by the excess of the value of the properties

over the cost of the stock, it is entitled to depletion deductions for the years 1926 to 1930, inclusive, computed upon the basis of the stipulated value of the depletable properties on the date they were received by it in the liquidation of Union. The Commissioner concedes the correctness of this holding, provided he is sustained upon the issue which he raised.

*Decision will be entered under Rule 50.*