Robert L. Fox and Virginia R. Fox v. Commissioner.
Fox v. Commissioner
Docket No. 2721-66.
United States Tax Court
T.C. Memo 1968-205; 1968 Tax Ct. Memo LEXIS 91; 27 T.C.M. (CCH) 1001; T.C.M. (RIA) 68205; September 19, 1968. Filed George Gump, 1508 First Nat'l Bank Bldg., Baltimore, Md., for the petitioners. Herbert A. Seidman, for the respondent. 1002 KERN Memorandum Findings of Fact and Opinion The respondent determined deficiencies in the income tax of petitioners as follows: Year
Deficiency
1958
$11,055.16
1959
$11,229.37
1960
$10,589.55
1961
$11,497.08
1962
$10,771.44
1963
$11,292.13
An issue involving *94 the compliance vel non of the respondent with the requirements of section 7605(b), I.R.C. 1954, with respect to the deficiency determined for 1958 has been conceded by petitioners. The issues remaining for our determination are: (1) Whether petitioners are to be taxed in each of the years in question on the redemption of certain preferred stock originally issued to petitioner Robert Fox and transferred by him to certain charities and, if so, whether such tax is imposed pursuant to section 306(a), I.R.C. 1954 or section 302(a), I.R.C. 1954. (2) Whether petitioners are entitled to the additional 10% deduction provided by section 170(b) (1) (A), I.R.C. 1954, on account of contributions made to the Sinai Hospital Research Fund in each of the years in question and (3) Whether the statute of limitations is a bar to any deficiency determined for the years 1958 and 1959. Findings of Fact Some of the facts have been stipulated and they are found accordingly. Petitioners, Robert L. Fox and Virginia R. Fox, husband and wife, resided in Baltimore, Maryland, at the time of the filing of their petition in this *95 case. They filed their joint income tax returns for the calendar years 1958 through 1963 with the district director of internal revenue at Baltimore, Maryland. Robert will be referred to as the petitioner herein. Fox Chevrolet, Inc., hereinafter sometimes referred to as the Company, was formed in 1933 by Robert and his brother, Louis J. Fox, hereinafter sometimes referred to as Louis. It is and has been in the business of selling Chevrolet automobiles in Baltimore and operates under a franchise from Chevrolet Motor Co., a division of General Motors. Robert served as president of the Company from its inception until July 1, 1958, at which time he resigned. Louis, who had served as vice-president prior to that time, succeeded Robert as president and continued in that capacity up until the time of the hearing of this case. Robert became vice-president and served as a vice-president and the treasurer of the Company during the years 1959 through 1963. During all of the years in question the board of directors of the Company consisted of Robert, Louis and Dorothy Fox, Louis' wife. As of June 30, 1958, the only authorized and outstanding capital stock of the Company was owned as follows: *96 Robert 2466 shares Louis 2466 shares For many years Robert had been suffering from arthritis of the spine. In 1955 this condition had become more serious and at petitioner's suggestion Carey T. Nugent was employed by the Company as general manager. In the first part of 1958 Robert decided, because of the deterioration in his health, to terminate his active association with the Company. Accordingly, he approached Louis and indicated that he would be willing to dispose of his entire interest in the Company. After short but friendly negotiations between the brothers it was agreed that Robert should receive $400,000 for his half interest in the Company, whose net worth was shown on the Company's books as of December 30, 1957 as being $739,397.22. For reasons that will appear, Louis informally proposed that the transaction be effected in the following way: (1) the recapitalization of the Company by authorizing common stock with a total par value of $400,000 and preferred stock with a total par value of $400,000, (2) the conversion of the outstanding capital stock into common stock and the distribution of the preferred stock as a dividend thereon, (3) the purchase and retirement by *97 the Company of Robert's common stock to be paid for by installment payments aggregating $200,000 which were to begin after a substantial period of time, (4) an agreement by Robert not to compete, and (5) an agreement by the Company to employ Robert in an advisory capacity at a certain annual salary. In their preliminary discussions early in 1958, Robert indicated he would leave the details of the arrangement with Louis. In these negotiations Louis was interested in accomplishing the arrangements with 1003 Robert in such a way as to facilitate the acquisition by Nugent of enough of the Company's equity capital to qualify him as a "dealer" or "operator" as defined in the Company's franchise agreement with the Chevrolet Motor Company, and also to facilitate the establishment by Robert of a charitable trust of a type which Louis felt could be used as an example in his solicitation of gifts as chairman for campaign planning of the National Council of Jewish Federations. In this connection he knew that rpobert intended to leave money to Sinai Hospital of Baltimore. The circumstances surrounding the creation of the charitable trust are more fully described infra. Louis was of the *98 opinion that Nugent could qualify as a "dealer" under the franchise if he became the owner of 25 percent of the Company's common stock, although it later developed that a "dealer" must be the owner of a 25 percent interest in the total investment in the Company. Nugent could raise $100,000, but he could not raise $200,000. The creation of the preferred stock and the reduction of the common stock of the Company to $200,000 as later accomplished constituted parts of the plan worked out by Louis to carry out the transfer of Robert's interest in a way to effectuate the other matters which Louis, with the approval of Robert, considered desirable. The oral understanding between Robert and Louis was made formal in a series of steps. First, on June 30, 1958, Louis and Robert and their wives executed an agreement rescinding a prior agreement relating to certain restrictions on the sale of the capital stock of the Company, the details of which are not relevant herein, which stated in part that: Robert L. Fox proposes to sell to the Company and the Company proposes to buy from him all of his stock in the Company, so that Louis J. Fox will then become the sole owner of all of the Company's *99 stock. Robert and Louis entered into an agreement on the next day, July 1, 1958, which was presented the same day to a meeting of the board of directors of the Company (consisting of Robert and Louis) at which time the agreement was authorized and approved by the Company. Pertinent parts of the agreement follow. EXPLANATORY STATEMENT Robert and Louis are the owners of all of the issued and outstanding capital stock of the Company consisting of Four Thousand Nine Hundred Thirty-two (4,932) shares of the par value of Ten Dollars ($10.00) each. Robert and Louis each owns Two Thousand Four Hundred Sixtysix (2,466) shares of said stock. Robert desires to sell his stock in the Company to the Company for cancellation and redemption, and the Company desires to purchase the same. The parties hereto agree that it is impossible at this time to determine accurately the value of certain real estate owned by the Buyer in which a portion of the Buyer's business is now being conducted at 2020 SOUTH HANOVER STREET in the City of Baltimore, Maryland, and for that reason, they have agreed that payment of the portion of the purchase price of the said stock which is attributable to the excess, *100 if any, of the real value of said real estate over and above the value thereof as shown on the books of the Buyer shall be deferred until the same may be sold. Louis believes that after Robert sells his stock in the Company it would be in his best interest and in the best interest of the Company to have one or more of his executive employees become the owner of some portion of the Company stock. For this reason the Company and Louis desire to lower the value of the Company's present stock by creating an issue of Preferred Stock so that the Company's Common Stock may be sold to an executive employee or employees at a reasonable figure. NOW, THEREFORE, in consideration of the premises and of the sum of Five Dollars ($5.00) each to the other in hand paid, the parties hereto have agreed and by these presents do agree, each with the other of them, as follows: FIRST: A. This Agreement is expressly made subject to the approval of the Chevrolet Division of General Motors Corporation, a Delaware corporation, and if such approval is not obtained by the 31st day of December, 1958, this Agreement shall be null and void and of no force and effect and neither party hereto shall be under any *101 liability to the other because of the execution of this Agreement. B. If said approval of the said Chevrolet Division of General Motors Corporation is obtained on or before the 31st day of December, 1958, the sale and purchase of stock hereunder shall take place Three (3) days after the Preferred Stock provided for hereinafter shall have been issued (unless some other date may be agreed upon by the parties hereto) which date is hereinafter referred to as the "Closing Date", but regardless of the actual day of closing all transactions 1004 provided for in this Agreement will take effect as if the Closing Date were July 1, 1958. SECOND: Louis and Robert agree they will each surrender to the Company for cancellation and redemption, as a contribution to the capital of the Company Four Hundred Sixty-Six (466) shares of the presently outstanding capital stock of the Company of the par value of Ten Dollars ($10.00) each. Louis and Robert further agree that after the surrender of the said Four Hundred Sixty-Six (466) shares each of the capital stock of the Company, they will as officers, directors and stockholders of the Company take prompt action to cause the Charter of the Company *102 to be amended to provide for an authorized capital of Eight Thousand (8,000) shares of which Four Thousand (4,000) shares shall be Preferred Stock of the par value of One Hundred Dollars ($100.00) each and Four Thousand (4,000) shares shall be Common Stock of the par value of Ten Dollars ($10.00) each. Said Amendment to the Charter of the Company will provide that the then presently outstanding Four Thousand (4,000) shares of Capital Stock of the Company shall be re-classified as Four Thousand (4,000) shares of Common Stock of the Company. The Preferred Stock to be authorized by said Charter Amendment shall be entitled to cumulative annual dividends at the rate of One Percent (1%) per annum dating from July 1, 1958 and shall contain such other provisions as counsel to the Company may deem necessary or desirable. Louis and Robert further agree that after the said Preferred Stock has been authorized, they will cause the Company to declare a dividend on its Common Stock of Four Thousand (4,000) shares of Preferred Stock in the ratio of one (1) share of Preferred Stock for each share of Common Stock then outstanding. THIRD: Robert agrees that after the said stock dividend has been *103 paid and on the Closing Date, he will sell, transfer, assign, convey and deliver to the Company, properly endorsed, Two Thousand (2,000) shares of the Common Stock of the Company of the par value of Ten Dollars ($10.00) each for redemption and cancellation, and the Company agrees that on the Closing Date, it will buy the said shares of stock for redemption and cancellation, all on the terms and conditions hereinafter set forth. FOURTH: The purchase price of the shares of Common Stock being bought by the Company and sold by Robert hereunder shall subject to the provisions of Paragraphs FIFTH and SIXTH hereof be Two Hundred Thousand Dollars ($200,000.00) payable as follows: Eight Thousand Dollars ($8,000.00) on July 1, 1969 and Eight Thousand Dollars ($8,000.00) on each July 1st thereafter until the said Two Hundred Thousand Dollars ($200,000.00) has been paid. Subject to the provisions of Paragraph FIFTH hereof the Company agrees to pay to Robert interest on the unpaid balances at any time outstanding under this Paragraph FOURTH accounting from July 1, 1958, at the rate of Six Percent (6%) during Robert's lifetime and if Robert's wife, Virginia R. Fox, (hereinafter called Virginia) *104 shall survive him at the rate of Four Percent (4%) during the period when the said Virginia shall be alive and Robert shall not be alive. Interest payable hereunder shall be payable on each July 1st. * * * SIXTH: If at any time during the lifetime of Robert or Virginia, the Company shall sell, exchange or otherwise transfer, either as a result of condemnation or threat of condemnation or otherwise, the real estate, or any part thereof, now owned by it and on which a portion of its business is conducted at 2020 South Hanover Street, Baltimore, Maryland, the Company agrees to pay to Robert, or to his estate, a sum which is equal to onehalf (1/2) of the excess, if any, of the total net consideration received by it over and above the sum of Thirty-Seven Thousand Dollars ($37,000.00) plus the depreciated cost of any new buildings and permanent improvements of old or new buildings made by the Company after July 1, 1958, such payment to be made in cash within ten (10) days after receipt of the same by the Company. * * * NINTH: A. The Company covenants and warrants that it will maintain its net working capital at least equal to One Hundred Percent (100%) of the principal balance outstanding *105 from time to time under the provisions of Paragraph FOURTH hereof until all of its obligations under Paragraph FOURTH hereof have been paid. The term "net working capital" shall mean the excess of the aggregate current assets over the aggregate current liabilities of the Company determined in accordance with sound accounting practice consistently maintained. B. The Company covenants and warrants that it will each year which this Agreement is in effect, furnish Robert with a copy of its annual balance sheet and operating statement duly certified by a certified public accountant or firm of 1005 certified public accountants regularly employed by the Company, immediately upon receiving the same and the Company further covenants and warrants that, upon written request, it will furnish to Robert any interim balance sheets and operating statements which it may prepare or cause to be prepared. The Company further agrees to permit Robert and his agents, attorneys and accountants at all reasonable times and from time to time to inspect and make copies of all of its books and records in order to permit Robert to ascertain whether or not either or both of the covenants contained in this *106 Paragraph NINTH have been violated. * * * ELEVENTH: A. Robert agrees that for a period of Thirteen (13) years after the Closing Date, he will not, without the prior written approval of the Company, enter into or carry on either directly or indirectly, whether as owner, employee or otherwise in the City of Baltimore or within Five (5) miles thereof, a like business to the business now carried on by the Company, which is the buying and selling of new and used automobiles, trucks and automotive equipment, at retail. B. Robert agrees that at all reasonable times when requested by the Company, he will consult with and give advice to the officers and directors of the Company, to the best of his ability, during said period of Thirteen (13) years. C. In consideration of Robert's agreement contained in this Paragraph ELEVENTH, and so long as Robert complies faithfully with his said agreements, the Company will pay to Robert the sum of Ten Thousand Dollars ($10,000.00) per year accounting from July 1, 1958 and continuing for a period of Thirteen (13) years or until the death of Robert, whichever shall first ocur [sic]. * * * IN WITNESS WHEREOF, Fox Chevrolet Sales, Inc., has caused *107 these presents to be executed in its name by its Vice-President and attested by its Secretary and Robert L. Fox and Louis J. Fox have signed and sealed these presents, in triplicate, all as of the day and year first above written. At the same meeting the board of directors passed a resolution proposing a change in the articles of incorporation of the Company in order to effect the terms of the referred to agreement. This amendment was approved by the shareholders of the Company (Robert and Louis) the same day, and formally adopted by the Company on September 5, 1958. The amendments to the Articles of Incorporation follow: FIRST: The Charter of the Corporation is hereby amended by striking out Paragraph FOURTH of said Charter and inserting in lieu thereof the following: "FOURTH: The total number of shares of stock of all classes which the Corporation has authority to issue is 8,000 shares divided into 4,000 shares of Preferred Stock of the par value of $100.00 per share having an aggregate par value of $400,000.00 and 4,000 shares of Common Stock of the par value of $10.00 per share having an aggregate par value of $40,000.00, the total aggregate value of both classes of stock *108 being $440,000.00. The following is a description of each class of stock of the Corporation with the preferences, voting power, restrictions, limitations as to dividends and qualifications of each class: A. Voting Rights 1. The holders of the Preferred Stock shall have no voting rights or powers whatsoever, any provisions of the laws of the State of Maryland to the contrary notwithstanding, provided, however, no change shall be made in the dividend rights, the rights on liquidations, dissolution, or winding-up or the redemption provisions as to the Preferred Stock without the affirmative vote of the holders of Two-Thirds (2/3) of the Preferred Stock then issued and outstanding. 2. The holders of the Common Stock shall be entitled to one vote for each share of Common Stock standing in his or her name on the books of the Company. B. Dividends 1. The holders of the Preferred Stock shall be entitled to cumulative dividends thereon at the rate of $1.00 per share per annum each when and as declared by the Board of Directors out of surplus or net earnings of the Company, payable annually on the first day of July in each and every year accounting from July 1, 1958, regardless *109 of the date of issue, to the holders of Preferred Stock of record on such date or dates as may be determined from time to time by the Board of Directors of the Company. 2. The holders of the Common Stock shall be entitled to receive such dividends as the Board of Directors may declare out of surplus or net earnings, provided, however, that in no event shall any dividend be paid or declared or set apart for the Common Stock unless all dividends on the Preferred Stock have been paid or declared and set apart therefor. C. Rights on Dissolution, Liquidation or Winding-Up 1. In the event of the liquidation, dissolution or winding-up, whether voluntary 1006 or involuntary, of the Company, each holder of Preferred Stock shall be entitled to be paid for each share of Preferred Stock held by him any amount equal to $100.00 per share plus [any] accumulated and unpaid dividends. In the event the assets of the Company are insufficient to permit payment in full to the holders of the Preferred Stock, then the assets of the Company remaining after the payment of its debts shall be distributed among the holders of Preferred Stock, pro-rata. 2. After and not until the holders of the *110 Preferred Stock have been paid in full as hereinabove provided, the remaining assets of the Company shall be distributed among the holders of the Common Stock, pro-rata. D. Redemption All or any part of the Preferred Stock may be redeemed at the option of the Company at any one time or from time to time on the first day of any month upon the payment of the sum of $100.00 per share plus an amount equal to the amount of all dividends accrued, accumulated and unpaid thereon to the date fixed for redemption and upon notice of such redemption given in the manner hereinafter provided. Such redemption may be made out of surplus, net profits and/or capital of the Company, subject to the laws of the State of Maryland. If less than all of the Preferred Stock at the time outstanding is to be redeemed, the Board of Directors of the Company may select the particular shares to be redeemed. The Company shall give notice of any redemption by mailing a copy thereof addressed to the holders of the Preferred Stock to be redeemed at their respective addresses appearing on the stock books of the Company at least 15 days prior to the redemption date. The Company shall, on or before the redemption date, *111 set aside the redemption price for the stock to be redeemed in a special fund and shall pay out the same to the holders of the Preferred Stock to be redeemed upon the presentation of the certificates therefor to the Company duly endorsed. Providing that the said notice is given as aforesaid and said redemption price is so set aside, no further dividends shall accrue or become due or payable upon the Preferred Stock called for redemption. Nothing herein contained shall limit any legal right of the Company to purchase any of the Preferred Stock at a price not in excess of the redemption price." Also, on July 1, 1958, Robert and Louis each contributed 466 shares of common stock of the Company, pursuant to the agreement, and Louis and Robert were elected president and vice-president respectively of the Company. On November 7, 1958, one certificate representing 2,000 shares of the new preferred stock was issued to Louis and ten certificates each representing 200 shares of the new preferred stock of the Company were issued to Robert. On November 21, 1958, the board of directors of the Company authorized a reduction in the common stock of the Company to facilitate the surrendering of *112 the 2,000 shares of common stock by Robert, which was physically accomplished on December 7, 1958. Robert and his wife did not report the receipt of the preferred stock of the Company on their income tax returns for the year 1958 or any other subsequent year. Prior to 1958 Louis had been active in various eleemosynary projects and during that year he served as national chairman for campaign planning of the National Council of Jewish Federations, composed of some 800 Jewish community organizations in North America, and in Baltimore served as president of the Jewish Welfare Fund. In his capacity as national chairman for campaign planning, Louis spent a good deal of time working with various Jewish community organizations in fund raising. One of the techniques of charitable giving with which Louis was familiar and one which he sought to promote within the National Council of Jewish Federations was the use of the inter vivos, or "living" trust in which the grantor reserved a life interest and the remainder was to go to a charity. Louis was interested in observing at first hand the creation and operation of such a trust so he could use it as an example in his efforts throughout the country *113 to encourage others to establish similar trusts. Sometime in September 1958, after Robert expressed a desire to sell his stock in the Company and withdraw from the active conduct of its business, Louis approached Robert, who, as Louis knew, was interested in making a testamentary gift to the Sinai Hospital in Baltimore. Louis indicated to Robert that his preferred stock could be donated to such a trust which would provide for the payment of its income to Robert and his wife during their lives and the payment of the corpus after their deaths to the Hospital. In this way Robert would avoid paying a capital gains tax on the difference between Robert's basis in the stock and its value, and, at the same time, secure a charitable deduction equal to the value of the remainder interest 1007 in the stock contributed while enjoying the income of the trust during his life. Robert was amenable to this suggestion of Louis' and the transactions referred to herein were carried out at the direction of Louis, with this consideration in mind. Specifically, the understanding between Robert and Louis was that Robert would create such a trust and transfer to it each year approximately 200 shares of *114 the 2,000 newly issued preferred stock and that, following such transfers, the Company would, "to the extent that it was convenient," redeem such stock from the trust. It was for this reason that the 10 certificates for 200 shares each were issued to Robert. However, it was not contemplated either that Robert would be legally bound to make a transfer to the trust in that or any amount, or that the Company would be legally bound to redeem stock thus transferred. Accordingly, on December 1, 1958, Robert executed a trust instrument, the petinent portions of which are set out below: THIS INDENTURE AND DECLARATION OF TRUST is made this 1st day of December, 1958, by ROBERT L. FOX, of the City of Baltimore, State of Maryland, (hereinafter called the "Grantor") and LEON H. BLOCK, of the City of Baltimore, State of Maryland, as Trustee (hereinafter called the "Trustee"). THIS INDENTURE AND DECLARATION OF TRUST WITNESSETH: That in consideration of the premises and in consideration of the acceptance by the Trustee of the trusts hereby created and of the sum of Five Dollars ($5.00) paid by the Trustee to the Grantor, and of other good and valuable considerations, receipt of all of which *115 is hereby acknowledged, the Grantor has assigned, transferred, set-over and conveyed to the Trustee Two Hundred (200) shares of the Preferred Stock of the par value of One Hundred Dollars ($100.00) per share of FOX CHEVROLET SALES, INC., a Maryland corporation, in trust and confidence nevertheless and upon the following uses and trusts: First: In trust to pay the net rent, interest and income from the trust estate at least as often as quarterly unto the Grantor as long as he is living and upon the death of the Grantor, to pay the said net rent, interest and income unto the Grantor's wife, VIRGINIA R. FOX, so long as she is living, and upon the death of the survivor of the Grantor and his said wife, Virginia R. Fox, to give, grant, assign, transfer, set-over and convey the corpus of the trust estate as then constituted unto the SINAI HOSPITAL OF BALTIMORE, INC., to be and become a part of the Sinai Hospital Research Fund. The Grantor directs that for a period of Ten (10) years after the death of the survivor of the Grantor and his said wife, no part of the income from or the principal of the Fund shall be used except for the purpose of research in the field of Arthritis. The Grantor *116 requests, but does not direct, that during the said Ten (10) year period, none of the income from or the principal of the Fund shall be used except for research in the subfield of spondylitis. At the end of the said Ten (10) year period, the said Sinai Hospital of Baltimore, Inc. may use all or any part of the income from or the principal of the Fund for any research project or projects in the discretion of the Board of Directors. SECOND: The term "net rent, interest and income" as used herein shall be defined in accordance with the applicable laws of the State of Maryland. Without limiting the generality of the aforegoing, no receipts resulting from the sale, redemption or other disposition of any shares of Preferred Stock of Fox Chevrolet Sales, Inc. (whether such shares constitute the original corpus of the trust or whether they may be subsequently added to the corpus of the trust) shall be considered as "net rent, interest and income" regardless of whether or not such proceeds are treated as "income" under the Federal Internal Revenue Code and, under no circumstances shall such proceeds be distributable by the Trustee to the Grantor or to his said wife, but on the contrary, any *117 such proceeds shall be invested and reinvested by the Trustee and his successor and shall ultimately be distributed to the said Sinai Hospital of Baltimore, Inc.
THIRD: The Trustee shall have the following discretionary powers which shall be in addition to and not in limitation of any other powers conferred upon him by this Indenture and Declaration of Trust: A. To invest and reinvest the trust estate when and in such manner as the Trustee shall deem proper. The Trustee is expressly authorized and empowered to invest and reinvest the trust estate, or any part thereof, in any securities which in his discretion shall seem advisable, at any time or times, including by way of illustration but not by way of limitation, common stocks, and whether or not any such securities are of the class in which Trustees may be permitted by law to invest trust funds, and whether or not of the kind in which trust funds are generally invested. The Trustee is hereby expressly authorized and empowered to retain as a trust investment any shares of Preferred Stock of Fox Chevrolet Sales, Inc., which may be a part of the original 1008 trust estate or which may subsequently be added to the trust estate. *118 B. To make sale or sales, to vote stock, in person or by proxy with or without power of substitution, to mortgage, pledge, exchange, lease, including leases for ninetynine years renewable forever, deposit or otherwise to dispose of any of the property originally granted, conveyed, assigned, transferred and set-over to the Trustee in trust, or which the Trustee may subsequently acquire by way of investment, reinvestment or otherwise. * * * SIXTH: This Indenture and Declaration of Trust is expressly and completely made irrevocable by the Grantor. The Grantor reserves no right at any time to alter, amend, terminate, rescind, or revoke this Indenture and Declaration of Trust, or any part thereof. The Grantor, however, reserves the right at any time and from time to time to add cash, real estate, stocks, bonds or other securities to the corpus of the trust estate, such additions to corpus to be held by the Trustee, in trust, on the same terms and conditions as the original corpus of the trust. * * * EIGHTH: The Trustees acknowledges [sic] receipt of Two Hundred (200) shares of the Preferred Stock of the par value of One Hundred Dollars ($100.00) each of Fox Chevrolet Sales, Inc. *119 NINTH: The Trustee is hereby authorized to receive and hold and add to the corpus of the trust any sum or sums of money or other property received by them from the Grantor or from any source whatsoever, provided such money or property is to be held and distributed and accounted for subject to the provisions of this Indenture and Declaration of Trust, and no other provisions. On December 2, 1958, Robert endorsed preferred certificate #1 (200 shares) over to Leon H. Block, hereinafter referred to as Block, an investment banker and longtime friend of the Fox brothers, as trustee, and delivered the certificate to Charles Sherman, the secretary of the Company. That same day Sherman cancelled certificate #1 and issued certificate #12, representing 200 shares to Block as trustee. Certificate #12 was then physically delivered to Block by either Robert or Sherman. Robert indicated to Block at the time of the creation of the trust that the corpus of the trust was to consist of shares of preferred stock of the Company to be transferred by Robert from time to time and that these shares would be "redeemed" by the Company shortly after their transfer to the trust. On December 16, 1958, the *120 following letter was sent to Louis from a representative of the Chevrolet Motor Division of General Motors: Dear Mr. Fox: It has come to our attention that 200 shares of the stock of Fox Chevrolet Sales, Inc., has been transferred to a foundation not connected with the operation of your business. In this connection, we would like to quote you Section 23-B, paragraph 4-C of your Selling Agreement which states - Any sale transfer relinquished voluntarily or involuntarily by operation of law or otherwise, of any interest in the direct or indirect ownership or act of management of a dealership without prior written approval of Chevrolet is grounds for termination. In addition, this particular transfer is in violation of Chevrolet's policies on financial participation in a dealership. In this connection, we quote from page J-92 of Dealer Organization Standard Procedures which states - It is not considered in the best interest of the dealership operation, of the dealer principles or of Chevrolet, for a dealer to transfer or allow another financial participant to transfer any part of the ownership to individuals or groups not making an active contribution to the dealership operation. *121 While an exception is made only in the case of the dealer's immediate family, no other individual or group whosoever [sic] not connected with the dealership in an active capacity is to own a financial interest in the Chevrolet dealership. In line with these two policies, we would like to request that you take immediate steps to acquire the shares which have been transferred or sold. Very truly yours, (Signed) R.P. Sullivan City Manager [of the Baltimore area for the Chevrolet Div.] At a special meeting of the board of directors of the Company held on December 16, 1958, Robert, after making reference to the letter from the Chevrolet Motor Company quoted above, moved "that the treasurer be authorized to purchase such shares [those shares transferred to the trust] of the company stock that may be so registered at an effective price of the book value of the class of stock." This motion was passed. 1009 Shortly thereafter Block, in his capacity as trustee for the trust, endorsed his certificate for 200 shares of preferred stock of the Company to the Company and delivered the certificate to Sherman, the Company secretary. Sherman cancelled the certificate on December 20, 1958, and *122 drew a check to Leon H. Block, Trustee, for $20,000, which check was delivered to Block. Two hundred shares of preferred stock of the Company were transferred on the books of the Company on each of December 2, 1959, and November 30, 1960, from Robert to Block as trustee and were purchased by the Company for $20,000 on the same day they were transferred to the trustee. At the following times, shares of preferred stock were transferred on the books of the Company from Robert to the trust, the shares were transferred back to the Company by Block, and a check was drawn to Block in payment therefor at the price of $100 per share: Date Transferred
to Block and
Date
Date of
No. of
New Certificate
Surrendered
Payment by
Year
Shares
Issued to Block
to Company
Company
1959
200
Dec. 2
Dec. 2
Dec. 4
1960
200
Nov. 30
Nov. 30
Dec. 7
1961
150
Nov. 17
Nov. 20
Nov. 21
1962
150
Nov. 13
Nov. 14
Nov. 14
1963
150
Nov. 26
Nov. 26
Nov. 27
In all of the years 1958 through 1963 the only assets transferred by Robert to the trust were shares of preferred stock of the Company. In 1958 through 1961 the proceeds of the preferred stock *123 were invested in tax-exempt securities on which the trust earned and paid to Robert an annual average amount "in excess of $1,000." Since the only income of the trust in those years was tax exempt, the trustee filed no income tax returns for those years. In the fiduciary returns filed by the trustee for the years 1962 and 1963, the receipt of income from dividends and interest was shown in the respective amounts of $1,113.86 and $1,706.61. The trust thus created qualified during the years here in question as an exempt organization under section 170(c), I.R.C. 1954. In connection with the trust, Block maintained a ledger sheet and a checkbook, the only two asset records kept by him relating to the trust. The ledger sheet, which reflected the date, quantity, and description of securities bought or received, or sold or delivered, did not contain any reference to the receipt of preferred stock of the Company, or to the receipt of the cash proceeds of the preferred stock received by Block. Block's checkbook record for the years 1958 through 1961 and 1963 reflected the amount of cash received by the trust with respect to the preferred stock without any reference *124 to receipt of the stock itself. His checkbook record for 1962 contained the notation "Fox preferred, $1,500." Prior to 1958 Louis had established a trust known as the Fox Foundation, hereinafter referred to as the Foundation, a Maryland corporation, which is and was in the years in question exempt from Federal income tax under section 501(c)(3), I.R.C. 1954. Robert had an understanding with the Foundation that it would satisfy obligations incurred by Robert to certain charities out of assets which would be transferred to it by Robert. In each of the years 1961, 1962, and 1963, Robert transferred to the Foundation 50 shares of preferred stock of the Company, the method of transfer being basically the same as the transfers to the trust, described, supra, i.e., the shares were endorsed over to the Foundation by Robert, a new certificate evidencing the Foundation's shares was issued by the Company to the Foundation, the shares were endorsed over to the Company by the Foundation (by its president, Louis), and a check was drawn therefor to the Foundation for $100 per share. The timing of these events was as follows: Year
No. of Shares
Date Transferred toFoundation and NewCertificate Issued toFoundation
Date Surrenderedto Company
Date of Paymentby Company
1961
50
Aug. 25
Aug. 25
Sept. 1
1962
50
Oct. 2
Oct. 10
Oct. 10
1963
50
Aug. 22
Aug. 23
Not reflectedby record
*125 1010 The proceeds of the cash payments to the Foundation were used by it, as agreed, solely to satisfy obligations of Robert to certain charities as they arose. The minute book of the Company did not contain any record of directors' or stockholders' meetings regarding the acquiring by the Company of shares of its outstanding preferred stock other than the record of the meeting on December 16, 1958, referred to supra. During the years 1958 through 1963 the Company neither sent notices to its preferred shareholders informing them of its intention to redeem the Company's preferred stock, nor did it, "on or before the redemption date, set aside the redemption price for the stock to be redeemed in a special fund," both of which requirements were set out in the amended Article of Incorporation set out, supra. The Articles also provided, however, that "[nothing] herein contained shall limit any legal right of the Company to purchase any of the Preferred Stock at a price not in excess of the redemption price [$100 per share]." The Dealer Organization Change form, one of the standard records maintained by the Chevrolet Motor Company, is prepared by employees of Chevrolet and *126 is based upon information received from the dealer either in writing or orally. Dealer Organization Change forms for the following dates contained the following statements: September 4, 1959 Robert L. Fox wishes to redeem 200 shares preferred stock, par value $100.00 per share, for total redemption of $20,000, reducing his preferred stock ownership to 1800 shares. November 16, 1960 Robert L. Fox wishes to redeem 200 shares preferred stock, par value $100.00 per share, total redemption $20,000. December 26, 1961 Robert L. Fox wishes to redeem 400 shares of his preferred stock at par value $100.00 per share, total redemption $40,000. December 28, 1962 Fox Chevrolet Sales, Inc. wishes to retire 100 shares of preferred stock owned by Mr. Louis J. Fox and 200 shares of preferred stock owned by Mr. Robert L. Fox. None of the Dealer Organization Change forms relating to the Company contained any reference to preferred stock owned by Block as trustee or by the Foundation. Sherman, who as secretary of the Company was responsible for notifying the Chevrolet Motor Company about changes in its stock ownership, wrote on December 8, 1961, the following letter to Chevrolet: *127 Please be advised that in accordance with the articles of incorporation referring to redemption of preferred stock, we have purchased from Mr. Robert L. Fox 800 shares, reducing his ownership to 1200 shares outstanding as of November 30th, 1961. Trusting this will furnish you with the information you require, we are Yours truly, Fox Chevrolet Sales, Inc. This letter was in error when it referred to a purchase "from Mr. Robert L. Fox" rather than from the trustee. Because of Robert's poor health and because of Louis' involvement in the charitable activities mentioned above, the Company in 1955 employed Carey T. Nugent as general manager. Sometime after it became known to Louis that Robert was to become almost totally inactive in the day-to-day operation of the Company, Louis thought it would be in the best interest of the Company for its general manager to participate in its earnings as owner of a part of the Company's equity capital. On December 31, 1958, the board of directors of the Company decided to create a second class of common stock (class B) and to designate the original common stock as class A which would have the effect of allowing the holders of class B stock to *128 participate after January 1, 1959, in the earnings of the Company by receiving 25 percent of the dividends paid on all the common stock and upon their death or retirement from the business 25 percent of the Company's accumulated net operating earnings. At a meeting of the stockholders of the Company on January 26, 1959, the amendments to the Articles of Incorporation necessary to effect the creation of the class B common stock were approved, pertinent parts of which follow: FIRST: The Charter of the Corporation is hereby amended by striking out Paragraph FOURTH of said Charter and inserting in lieu thereof the following: - FOURTH: The total number of shares of stock of all classes which the Company has authority to issue is Eight Thousand (8,000) shares divided into Four Thousand (4,000) shares of Preferred Stock 1011 of the par value of One Hundred Dollars ($100.00) per share having an aggregate par value of Four Hundred Thousand Dollars ($400,000.00) and Two Thousand (2,000) shares of Common Stock Class A of the par value of Ten Dollars ($10.00) per share having an aggregate par value of Twenty Thousand Dollars ($20,000.00) and Two Thousand (2,000) shares of Common Stock *129 Class B of the par value of Five Dollars ($5.00) per share having an aggregate par value of Ten Thousand Dollars ($10,000.00), the total aggregate par value of all classes of stock being Four Hundred Thirty Thousand Dollars ($430,000.00). The following is a description of each class of stock of the Corporation with the preferences, voting power, restrictions, limitations as to dividends and qualifications of each class: * * * II. Common Stock A. Voting Rights 1. The holders of the Common Stock Class A shall be entitled to two (2) votes for each share of Common Stock Class A standing in his or her name on the books of the Company. 2. The holders of the Common Stock Class B shall be entitled to one (1) vote for each share of Common Stock Class B standing in his or her name on the books of the Company. B. Dividends 1. The holders of the Common Stock Class A and Common Stock Class B shall be entitled to receive such dividends as the Board of Directors may declare out of surplus or net earnings, provided, however, that in no event shall any dividend be paid or declared or set apart for either class of the Common Stock unless all dividends on the Preferred Stock have been *130 paid or declared and set apart therefor. 2. The holders of the Common Stock Class A shall be entitled to receive 75% of all dividends paid on the Common Stock of both classes and the Common Stock Class B shall be entitled to receive 25% of such dividends, provided, however, that the holders of the Common Stock Class B shall not be entitled to receive any dividends at any time if the aggregate dividends paid to the holders of Common Stock of both classes after January 1, 1959 equal or exceed the total net operating earnings of the Company earned after January 1, 1959; all dividends paid on the Common Stock thereafter shall be paid to the holders of the Common Stock Class A until such time as the net operating earnings of the Company earned after January 1, 1959 shall be more than the total dividends paid on the Common Stock of both classes after January 1, 1959, at which time the above described ratio of 75% and 25% shall again come into effect, and so on from time to time. C. Rights on Dissolution, Liquidation or Winding-Up 1. After and not until the holders of the Preferred Stock have been paid in full as provided in Paragraph I-C hereof, assets of the Company equal in value *131 to the accumulated net operating earnings of the Company earned after January 1, 1959 shall be distributed to the holders of the Common Stock in the ratio of 75% thereof to the holders of the Common Stock Class A and 25% thereof to the holders of the Common Stock Class B. 2. After and not until the holders of the Preferred Stock have been paid in full as hereinabove provided and after and not until a sum equal to the accumulated net operating earnings of the Company earned after January 1, 1959 has been distributed as above set forth, the remaining assets of the Company shall be distributed among the holders of the Common Stock Class A. D. Restrictions on Alienations 1. All of the shares of Common Stock Class A shall be freely alienable. 2. No share of the Common Stock Class B of the Company shall be transferred or disposed of either voluntarily or by operation of law either inter vivos or by reason of Will or intestacy except to the Company or to a person who is at the time of the transfer a holder of the Company's Common Stock Class A. 3. In the event of the death of any holder of the Common Stock Class B of the Company and before any of said stock may be transferred or *132 disposed of whether by reason of Will or intestacy, the personal representatives of the holder of the Common Stock Class B so dying shall promptly offer for sale all of the shares of Common Stock Class B of the Company owned by said decedent to the Company at the price and on the terms hereinafter set forth and the Company shall have the right to purchase the same. 4. In the event that any holder of any share or shares of the Common Stock Class B of the Company who is in the service of or an employee of the Company ceases to be a full time employee of the Company for any reason whatsoever whether voluntarily or involuntarily (including, but not by way of limitation discharge therefrom) such holder shall immediately offer for sale to the Company 1012 all of his shares of the Common Stock Class B of the Company at the price and on the terms hereinafter set forth and the Company shall have the right to purchase the same. 5. In the event a person dying or leaving the full time employ of the Company is the owner of all of the issued and outstanding shares of Common Stock Class B of the Company, the purchase price for such shares shall be a sum equal to the par value thereof plus *133 25% of the accumulated net operating earnings of the Company earned since January 1, 1959, and if the person so dying or leaving the employ of the Company shall own less than all of the then issued and outstanding shares of Common Stock Class B of the Company, the purchase price of each share owned by him shall be the purchase price as above set forth divided by the number of shares of Common Stock Class B of the Company then outstanding. "Accumulated net operating earnings" shall be computed as of the end of the month preceding the date of the death or cessation of full time employment by the Company of a holder of the Common Stock Class B. Pursuant to the board of directors' action on December 31, 1958, and the stockholders' action of January 26, 1959, all of the authorized shares of class B common stock (2,000 shares) were issued to Nugent on February 9, 1959, for $10,000. It was the policy of the Chevrolet Motor Company that for one to qualify as a "dealer" or "operator" on the franchise agreement he must have a 25 percent financial interest in "the total investment that is operating the franchise." Therefore, Nugent never became listed on the dealer franchise contract as a *134 "dealer" or "operator" although he owned 25 percent of the total number of shares, common and preferred, of the Company. Nugent died in 1962. In accordance with the Articles of Incorporation, as amended, his class B common stock was purchased by the Company for the sum of $45,053.97, representing his original cost of $10,000, plus 25 percent of the earnings of the Company from January 1, 1959, until Nugent's death. The Sinai Hospital of Baltimore, hereinafter sometimes referred to as the Hospital, is a corporation of which certain assets, facilities, and staff constituted the Sinai Hospital Research Fund, hereinafter sometimes referred to as the Research Fund. The Hospital controls the Research Fund to the extent that it could terminate the Research Fund. During the years in question until January 1962, the operations and expenditures of the Research Fund were reflected as part of the Hospital's operating budget. After January 1962 the financial activities of the Research Fund were reflected in a special part of the annual financial statement of the Hospital in addition to the operating report. The major source of revenue for the Research Fund came through grants made to the Hospital *135 for various research projects by the National Institutes of Health. Other funds were contributed by corporations and individuals. The building which houses the activities of the Research Fund is physically connected with the Hospital but separate in its function. It is designed for research and is not used for patient care except as it relates to research. Since January 1962 the Research Fund has had its own accounting department, its own bank account, and pays its own research expenses. About 90 percent of those employed by the Research Fund are so employed exclusively by it and are paid directly by it. The remaining 10 percent, which are employed both by the Hospital and the Research Fund, are paid by the Hospital, which is reimbursed by the Fund for the portion of the payment relating to work done for the Research Fund. Since January 1963, the Research Fund has paid to the Hospital certain "overhead costs," such as rent, based upon the portion of the expense that related to the Research Fund. Since January 1962 no part of the "operating funds" of the Hospital has been turned over to the Research Fund, other than those grants and awards made to the Hospital which were especially *136 earmarked by the donor for research. Neither the Hospital nor the Research Fund gave a commitment to Robert that any property received from the trust by it would be spent within 5 years of receipt. The petitioners executed a waiver extending the statute of limitations on the assessment of income taxes due for 1958 until April 15, 1966, conditioned upon the applicability of section 6501(e), I.R.C. 1954. The statutory notice of deficiency relating to all of the years in question was mailed to petitioners on March 25, 1966. Opinion KERN, Judge: The first question to be decided is whether the respondent is correct 1013 in his contention that regardless of the formal steps taken, in substance, the shares of preferred stock were redeemed by the Company, not from the trust or Foundation, but from petitioner himself, who in reality transferred the proceeds of the stock redemptions, $20,000 in each of the years in question, to the trust in some years and to the trust and the Foundation in others, rather than the stock itself. The general rule with which we start our consideration of this question is stated by us in a comparatively recent case involving *137 a similar factual background as follows: "A gift of appreciated property does not result in income to the donor so long as he gives the property away absolutely and parts with title thereto before the property gives rise to income by way of a sale." Humacid Co., 42 T.C. 894, 913. While recognizing the validity of this general rule, the respondent points to a variety of elements in the transactions indicating the existence of a prior "understanding" between petitioner and Louis that the shares would, if possible, be redeemed by the Company after they were transferred to the trust or to the Foundation. In this regard, respondent relies on, for example, assurances made by Louis to petitioner concerning the Company's intent to redeem preferred shares tendered to it, the fact that Louis was issued one certificate for his 20,000 preferred shares while petitioner was issued 10 certificates, each evidencing 200 shares, the fact that the shares would have been of little value to petitioner as the income beneficiary or to the charities as remaindermen unless they were redeemed, and that *138 the redemption took place in each year soon after the transfer to the charity or charities. Because of this prior "understanding" between petitioner and Louis, respondent would have us conclude that since the redemption of the preferred stock was "prearranged," in that it was understood prior to its transfer to the trust and Foundation that the Company would redeem such preferred stock shortly after its transfer "to the extent that it was convenient," the redemption must be considered as in substance a redemption from petitioner rather than from the trust and Foundation and, therefore, the proceeds of the redemptions are taxable to petitioner. There can be no doubt that petitioner expected and anticipated that the shares which he transferred to the charities would be redeemed by the Company. But it is equally clear that the Company was not under any obligation to petitioner or to the trust or Foundation to do so. Absent any specific obligation, the redemption of the preferred stock was, by the Company's Articles of Incorporation, "at the option of the Company." Petitioner was not in a position to force the Company to exercise this option since the Company was controlled not by him *139 but by his brother. We think petitioner parted with all of his interest and control over the preferred shares by delivering or causing to be delivered the endorsed certificates to the trust and to the Foundation and by causing the transfers to be formally recorded on the books of the Company. Petitioner has referred us to a number of cases involving gifts of property and the subsequent disposition of such property by the donees pursuant to prior understandings which imposed no obligations. In our opinion, the rationale of these cases requires a decision herein for the petitioner on this issue. Humacid Co., supra; Stuart A. Rogers, 38 T.C. 785; Theodore D. Stern, 15 T.C. 521; Sheppard v. United States, 361 F. 2d 972; Jacobs v. United States, 280 F. Supp. 437 (S.D.Ohio, 1966), affd. 390 F. 2d 877 (C.A. 6, 1968); Apt v. Birmingham, 89 F. Supp. 361 (N.D. Iowa, 1950); Winton v. Kelm, 122 F. Supp. 649 (D. Minn., 1954). We need not discuss the various factual patterns in the cited cases except to point out that in each case the donor of the property was assured by a "prior *140 understanding" of the ultimate disposition of the property by the charity donee. Since in this case the "understanding" imposed obligations on no one, and full rights of ownership to the preferred stock were transferred by petitioner to the charities prior to its redemption and these transfers were not sham transactions, we conclude here as we did in Waterman Steamship Corp., 50 T.C. 650, that "the substance [of the transaction] should not be considered to differ from its form merely because the same result might have been accomplished by the parties by another method which would have produced a higher tax." It follows that the amounts received by the trust and Foundation upon the redemption by the Company of the preferred stock given them by petitioner did not constitute income taxable to petitioner. 1014 Our conclusion with regard to the question previously stated makes it unnecessary to decide the questions which the parties have raised in connection with the taxability to petitioner of the proceeds of the redemption of the preferred stock under the provisions of *141 section 306, I.R.C. 1954. It is respondent's position that the preferred stock was in reality redeemed from petitioner, that it was section 306 stock as defined by section 306(c)(1)(A) and, therefore, the proceeds of its redemption are taxable to petitioner under section 306(a)(1)(A) as "gain from the sale of property which is not a capital asset." On the other hand, petitioner advances the very persuasive argument that, even if the redemptions of the preferred stock should be considered as having been made from petitioner, they would not be considered as giving rise to income other than capital gains under section 306(a)(1)(A) because of the provisions of section 306(b)(4)(B), I.R.C. 1954, [1] and section 1.306-2(b)(3), Income Tax Regs., [2] which make section 306(a) inapplicable to situations concerning which "the Secretary or his delegate" is satisfied that there has been a disposition by the taxpayer of the stock upon which the section 306 stock was issued prior to the disposition (or redemption) of the section 306 stock and that the principal purpose of the disposition of the section 306 stock is not the *142 avoidance of Federal income tax which section 306 is intended to prevent. Petitioner's interpretation of the statute and the regulation appears to be consistent with the legislative intent with regard to the purpose of section 306. See S. Rept. No. 1622, 83d Cong., 2d Sess., p. 46 (1954). However, since we have concluded that petitioner effected valid transfers of the preferred stock to the charities prior to its redemption, it is obvious that, even though this stock was section 306 stock, its disposition by gift does not give rise to income to the donor, and the respondent does not contend otherwise. *143 In his notice of deficiency, the respondent determined that petitioner was not entitled to the additional 10 percent charitable deduction allowed under section 170(b)(1)(A), I.R.C. 1954, for the transfer of preferred stock to either the trust or the Foundation. Respondent, on brief, abandons this determination with respect to the donation to the Foundation but adheres to his contention that the additional deduction is not allowable in the years in question with respect to the trust. It is the respondent's position that the charitable beneficiary of the trust was not the Sinai Hospital but the Sinai Hospital Research Fund, and that section 170(b)(1)(A)(iii), [3] expressly provides that the additional deduction in the case of a contribution of an individual to a medical 1015 research organization operating in conjunction with a hospital is to be allowed only if the organization is committed to spend the contributions for research within 5 years from the date of the contribution, a commitment which was not present in this case. *144 Petitioner concedes that no such commitment was made either by the Sinai Hospital or by the Sinai Hospital Research Fund. Petitioner contends, however, that the charitable beneficiary of the trust was the Sinai Hospital rather than the Research Fund, in which case the additional deduction would be allowable whether or not any commitment had been made by the recipient. The relevant portion of the trust instrument provides that upon the death of the life beneficiaries the corpus is to be conveyed to: * * * the SINAI HOSPITAL OF BALTIMORE, INC., to be and become a part of the Sinai Hospital Research Fund. The Grantor directs that for a period of Ten (10) years after the death of the survivor of the Grantor and his said wife, no part of the income from or the principal of the Fund shall be used except for the purpose of research in the field of Arthritis. * * * At the end of the said Ten (10) year period, the said Sinai Hospital of Baltimore, Inc. may use all or any part of the income from or the principal of the Fund for any research project or projects in the discretion of the Board of Directors. [Emphasis supplied.] The language of the trust agreement clearly reflects an *145 intent to make a gift to that part of Sinai Hospital engaged in research, that is, the Sinai Hospital Research Fund. The respondent's regulations (sec. 1.170-2(b)(4)(ii)(a) and (c), Income Tax Regs.) which are not challenged herein by petitioner, interpret section 170(b)(1)(A) (iii), regarding medical research organizations, as contemplating, and in fact requiring, a close relationship between the Hospital and the medical research organization: * * * the charitable contribution must be made to a medical research organization that is directly engaged in the continuous active conduct of medical research in conjunction with a hospital * * *. * * * The organization need not be formally affiliated with a hospital to be considered engaged in the active conduct of medical research in conjunction with a hospital, but it must be physically connected, or closely associated, with a hospital. In any case, there must be a joint effort on the part of the research organization and the hospital pursuant to an understanding that the two organizations shall maintain continuing close cooperation in the active conduct of medical research. For example, the necessary joint effort will normally be found *146 to exist if the activities of the medical research organization are carried on in space located within or adjacent to a hospital provided that the organization is permitted to utilize the facilities (including equipment, case studies, etc.) of the hospital on a continuing basis in the active conduct of medical research. * * * We conclude that petitioner intended to make and succeeded in making a gift in trust to the Research Fund of the Sinai Hospital and that the Research Fund was sufficiently separate from the Hospital to enable it to be considered as the donee within the meaning of section 170(b)(1)(A) (iii), I.R.C. 1954. We decide this issue for the respondent. The parties agree that the statute of limitations is a bar to any deficiency for the years 1958 and 1959 unless petitioner failed to report 25 percent of its gross income in those years. See section 6501(e). As a result of our decision for petitioners as to the primary issue in the case, petitioner prevails here: the years 1958 and 1959 are closed by reason of the statute of limitations. Decision will be entered under Rule 50. Footnotes
1. SEC. 306(b). Exceptions. - Subsection (a) shall not apply - * * * (4) Transactions not in avoidance. - If it is established to the satisfaction of the Secretary or his delegate - * * * (B) in the case of a prior or simultaneous disposition (or redemption) of the stock with respect to which the section 306 stock disposed of (or redeemed) was issued, that the disposition (or redemption) of the section 306↩ stock, was not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income tax. 2. Sec. 1.306-2(b)(3). A disposition or redemption, if it is established to the satisfaction of the Commissioner that the distribution, and the disposition or redemption, was not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income tax. However, in the case of a prior or simultaneous disposition (or redemption) of the stock with respect to which the section 306 stock disposed of (or redeemed) was issued, it is not necessary to establish that the distribution was not in pursuance of such a plan. For example, in the absence of such a plan and of any other facts the first sentence of this subparagraph would be applicable to the case of dividends and isolated dispositions of section 306 stock by minority shareholders. Similarly, in the absence of such a plan and of any other facts, if a shareholder received a distribution of 100 shares of section 306 stock on his holdings of 100 shares of voting common stock in a corporation and sells his voting common stock before he disposes of his section 306 stock, the subsequent disposition of his section 306↩ stock would not ordinarily be considered a disposition one of the principal purposes of which is the avoidance of Federal income tax.
3. SEC. 170. CHARITABLE, ETC., CONTRIBUTIONS AND GIFTS. * * * (b) Limitations. - (1) Individuals. - In the case of an individual the deduction provided in subsection (a) shall be limited as provided in subparagraphs (A), (B), (C), and (D). (A) Special Rule. - Any charitable contribution to - * * * (iii) a hospital referred to in section 503 (b)(5) or to a medical research organization (referred to in section 503(b)(5)) directly engaged in the continuous active conduct of medical research in conjunction with a hospital, if during the calendar year in which the contribution is made such organization is committed to spend such contributions for such research before January 1 of the fifth calendar year which begins after the date such contribution is made.↩