SCIENTIFIC INSTRUMENT COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 27620. Promulgated January 31, 1952.

*William C. Allee, Esq.,* and *G. Leslie Field, Esq.,* for the petitioner.
*Cyrus A. Neuman, Esq.,* for the respondent.

1254

OPINION.

TIETJENS, *Judge:* The question to be decided is whether or not respondent was correct in determining that petitioner acquired the assets here involved as the result of a tax free reorganization within the meaning of section 112 (g) of the Revenue Act of 1936. Respondent's position, on brief, is that the transaction in which petitioner acquired the assets qualifies as a tax free reorganization under either clause (B) or clause (C) of section 112 (g) (1) of that Act.[1]

[1] SEC. 112. RECOGNITION OF GAIN OR LOSS.

    \*      \*      \*      \*      \*      \*

  (g) DEFINITION OF REORGANIZATION.—As used in this section and section 113—

    (1) The term "reorganization" means \* \* \* (B) the acquisition by one corporation in exchange solely for all or a part of its voting stock: \* \* \* of substantially all the properties of another corporation, or (C) a transfer by a corporation

Because we think the transaction is governed by clause (C) we will make no disposition of respondent's contention with respect to clause (B), which would require an answer to the question whether the inclusion of warrants to purchase voting stock as well as stock in the exchange kept the exchange from being one "solely" for voting stock.

With reference to clause (C) respondent's summarized argument is that the stockholders of the old corporation acquired ownership of 75,000 shares of petitioner's stock on December 30, 1936, simultaneously with the transfer by bill of sale of the old corporation's assets to petitioner. This ownership constituted at that time 100 per cent control of petitioner and it was not until late in February 1937 that this control became less than 80 per cent because of dilution resulting from sale of stock to the public. Thus, in the words of the statute, "immediately after the transfer" the requisite control of the petitioner was in the hands of the "transferor or its stockholders" and so remained for almost two months.

Petitioner attacks this position on two fronts: *First*, petitioner argues that neither the old corporation nor its stockholders ever had the requisite control as a matter of fact, because neither had "ownership" of the 75,000 shares until a stock certificate was issued on March 2, 1937, and at that time the 75,000 shares did not represent 80 per cent control, 29,000 shares, in the meantime, having been issued to the public; and *Second*, the argument is made that the correct date for measuring control, in any event, is April 14, 1937, the date by which 50,000 shares had been sold to the public as contemplated by the integrated plan of reorganization and the "plan" thus consummated. If this argument is accepted, then the old corporation's control had been diluted to less than the required 80 per cent on the decisive date.

We cannot agree with petitioner's first position. Ownership by the old corporation and its stockholders of stock in the new corporation does not depend on the formality of registering and delivering stock certificates. The new corporation was organized on December 31, 1936. (There is some confusion in the record as to whether this took place on December 30, 1936, or December 31, 1936, but it is clear that the organization meeting and acceptance of the old corporation's offer of transfer took place on December 30. The difference in dates appears immaterial.) At the first meeting of the new corporation's

of all or a part of its assets to another corporation if immediately after the transfer the transferor or its stockholders or both are in control of the corporation to which the assets are transferred, * * *

(h) DEFINITION OF CONTROL.—* * * "control" means the ownership of stock possessing at least 80 per centum of the total combined voting power of all classes of stock entitled to vote and at least 80 per centum of the total number of shares of all other classes of stock of the corporation.

board the offer of the old corporation to transfer its assets to the new was accepted in full payment for 75,000 shares of stock of the new corporation and certain warrants, and it was thereupon resolved to transfer the 75,000 shares to the old and the corporate officers were directed so to do. The bill of sale of the assets was dated December 30, 1936, confirmed by the old corporation, and the assets effectively transferred to the new corporation on that date. We think these transactions had the immediate effect of making the old corporation the owner of 75,000 shares of the new stock regardless of the fact that no stock certificate was actually issued until March 2, 1937. *W. F. Marsh*, 12 T. C. 1083. See also *Carel Robinson*, 19 B. T. A. 751; *Federal Grain Corporation*, 18 B. T. A. 242.

It thus appears that "immediately after the transfer" the old corporation had the requisite ownership of stock to constitute control of the new corporation within the meaning of the statute. The 75,000 shares owned by the old corporation were the only outstanding shares until the sale of additional stock to the public commenced on February 17, 1937.

This conclusion answers petitioner's first contention. It would dispose of the case unless all of the "steps" provided for in the agreement of December 22, 1936, are to be treated as a single indivisible transaction. Our study of the cases and articles on this subject has revealed no readily applicable general principle leading to solution of the problem. We gather that the answer can be found if we give consideration to the mutual interdependence of the steps, the time element, the intent of the parties, and the ultimate result. See Paul, Selected Studies in Federal Taxation, 2d Series, p. 200; New York University Eighth Annual Institute on Federal Taxation, 129; *ibid* Ninth Annual, 1219; *American Bantam Car Co.*, 11 T. C. 397, affd. 177 F. 2d 513; and cases analyzed therein. We must do the best we can with the materials present in the record at hand.

To be sure, the agreement of December 22, 1936, contemplated raising additional capital by the sale of stock to the public and this eventually took place. But we are not convinced that this was a step necessarily governing the date on which "control" of the transferee is to be determined. The core steps of the plan, as we view it, were the formation of the new corporation and the transfer to it of the assets of the old, thus insuring continuity of operations, remembering that the charter of the old corporation would expire in 1937—the end of its 30-year charter period. These steps, so far as we can see, could stand alone. Their effectiveness did not depend on new capital. Granted that additional capital was desirable, were the steps by which it was to be raised a *sine qua non* to the plan simply because encompassed in the written agree-

ment? We think not. The plan may or may not have been successful without new capital. The agreement carried no guarantee that additional shares would be purchased by the public. There was no assurance or requirement in this plan that the old corporation or its stockholders would ever relinquish control. Nor was there any provision in the contract that the proposed transfer of assets would be undone if the public was not responsive to the public share offering. These steps, i. e., the organization of the new corporation, the transfer of assets to it, the issuance of shares to the old corporation, and the sale of stock to the public, were not mutually interdependent. If we were required under these facts to wait until the public shares were finally sold before determining whether or not the transferor corporation had 80 per cent control of the new corporation we might never be able to determine that question. The only requirement in this respect was that the shares be offered at an indefinite date if, as, and when approved by the Michigan Corporation and Securities Commission. Prospective purchasers of the public shares were, of course, not parties to the plan and there was no party to the agreement obligated to take enough new shares to reduce the old corporation's holding below the 80 per cent necessary to constitute control.

In this latter respect, it might have been argued by petitioner that the provisions of the plan calling for purchase by Securities Investment Company of 37,500 shares of the stock held by the old corporation's shareholders was an integral step in the plan which would effectively require divestiture by the old interests of the requisite statutory control of the new corporation and thus bring the case in line with such decisions as *S. Klein on the Square, Inc.*, 14 T. C. 786. Petitioner does not press this point, however, presumably because the parties themselves did not carry out that part of the agreement. We attach no more importance to it than did the parties.

For the purposes of this proceeding we hold that the steps relating to the sale of shares to the public are to be treated separately from the formation of petitioner and the transfer to it of the assets of the old corporation as consideration for 75,000 shares of petitioner's stock. Accordingly, we sustain respondent in his determination that petitioner acquired the assets in question as the result of a tax free reorganization within the meaning of section 112 (g) of the Revenue Act of 1936.

Our decision makes it unnecessary to consider respondent's alternative contention, that petitioner has not adequately proven the cost to it of the assets acquired.

Reviewed by the Court.

*Decision will be entered under Rule 50.*