## MAY BROADCASTING CO. v. UNITED STATES.

Nos. 14638, 14639, 14640.

United States Court of Appeals Eighth Circuit.

Jan. 8, 1953.

Robert J. Bannister, Des Moines, Iowa (Paul F. Ahlers and James E. Cooney, Des Moines, Iowa, on the brief), for appellant.

Harry Marselli, Sp. Asst. to Atty. Gen. (Charles S. Lyon, Asst. Atty. Gen., Ellis N. Slack, Lee A. Jackson, and S. Dee Hanson, Sp. Assts. to Atty. Gen., William R. Hart, U. S. Atty., and Cloid I. Level, Asst. U. S. Atty., Des Moines, Iowa, on the brief), for appellee.

Before GARDNER, Chief Judge, and WOODROUGH and COLLET, Circuit Judges.

WOODROUGH, Circuit Judge.

These appeals are taken to reverse judgments of dismissal entered in three actions brought by the taxpayer May Broadcasting Company for the recovery of excess profits taxes collected from it, as it claims wrongfully, for the years 1943, 1944 and 1945. The same issues were involved in each of the cases and they were consolidated for trial. They are presented here on a single record which includes the findings and conclusions of the trial court on which the judgments of dismissal were based.

Plaintiff claimed in the trial court and contends on these appeals that the fair market value of its property which should

have been used for computing excess profits taxes was $400,000. The Commissioner determined that the amount to be used for such computation was the carried over basis of the transferor which he fixed at $100,524.39 for the year 1940, together with the addition of earnings retained by the plaintiff in subsequent years, and on the trial of the cases the court sustained that determination of the Commissioner. The court held against the plaintiff on two grounds: (1) That there was no evidence to establish a fair market value of plaintiff's property higher than $100,524.39, and (2) that the taxpayer acquired its assets in a tax free exchange in 1940 for its authorized issued stock within the meaning of Section 112(b) (5) and (h) of the Internal Revenue Code[1] and therefore must use the carried over basis of the transferor (May Seed and Nursery Company) in determining the value of its assets received from the latter in that year as provided by Section 113(a) (8) of the Code[2] for the purpose of computing its equity invested capital and in turn its excess profits taxes

for the taxable years 1943 through 1945 under the provisions of Section 718(a) of the Code.[3]

It appears without dispute that the May Seed and Nursery Company, here referred to as the Seed Company, has been engaged in the seed and nursery business at Shenandoah, Iowa, for many years. It established the broadcasting station named K M A to further its business by advertising its products and merchandise and operated the station as a department of the business for about 15 years. It had a favorable wave length and day and night time channel and built up a large listening audience. Although it broadcast some advertising for other firms, its operation as a department of the Seed Company tended to identify it with that company's general business. The station was set up on the books of the Seed Company so as to show only the physical values and costs, amounting as shown by the Commissioner to $100,524.39, and there was no segregation of the station's good will value from the good will value of the seed and nursery business.

1. 26 U.S.C.A. § 112(b) (5) provides,
"(5) Transfer to corporation controlled by transferor. No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange. * * *"

"(h) Definition of control. As used in this section the term 'control' means the ownership of stock possessing at least 80 per centum of the total combined voting power of all classes of stock entitled to vote * * *."

2. Section 113(a) (8) provides,
"Property acquired by issuance of stock or as paid-in surplus. If the property was acquired after December 31, 1920, by a corporation—
"(A) By the issuance of its stock or securities in connection with a transaction described in section 112(b) (5) (including, also, cases where part of the

consideration for the transfer of such property to the corporation was property or money, in addition to such stock or securities), or

"(B) as paid-in surplus or as a contribution to capital, then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made."

3. Section 718(a) provides,
"The equity invested capital for any day of any taxable year shall be determined as of the beginning of such day and shall be the sum of the following amounts, reduced as provided in subsection (b)—[sub-section (b) not applicable]
"(1) Money paid in. Money previously paid in for stock, or as paid-in surplus, or as a contribution to capital;
"(2) Property paid in. Property (other than money) previously paid in (regardless of the time paid in) for stock, or as paid-in surplus, or as a contribution to capital. Such property shall be included in an amount equal to its basis (unadjusted) for determining loss upon sale or exchange. * * *"

854

That K M A broadcasting station did have a value far beyond its physical components was obvious and well understood, and in 1937 the St. Louis Star-Times, which owned the St. Louis station K X O K, offered to buy the station for $300,000 and was prepared to offer $325,000. Mr. May would not sell.

But in 1939, the Seed Company entered into negotiations with the representatives of the Central Broadcasting Company, here referred to as Central, which operates the largest broadcasting station in Iowa (K R N T), for the sale to that company of an interest in the K M A station. There was no talk of selling the entire property but only a substantial interest and one which would carry a voice in the control.

■ The negotiations culminated in a complete understanding and agreement between the parties, evidenced by written contracts about which there has been no dispute. Although the Seed Company first asked $125,000 and the Central Company first offered $100,000 for the quarter interest in the K M A broadcasting station, the agreement was reached upon arms length bargaining on the part of both the well-informed and competent parties that the Seed Company would sell and the Central Company would buy a one-fourth interest for $100,000. The transaction so carried on at arms length was demonstrative of the fair market value of the property because the price was fixed and agreed to by the informed seller who was willing but not obliged to sell, and the informed purchaser who was willing but not obliged to buy.

■ On the trial, the experienced and informed representative of the Central Company who negotiated the sale testified that in his opinion the value of the station was $400,000 and no one disputed him. After the sale the taxpayer earned some excess profits computed on the basis of that value. From the standpoint of reality alone, there could not be any reasonable doubt that the station had about the fair market value of $400,000 now claimed by the taxpayer.

But though the value, the fact of sale, and the price agreed upon for the one-fourth interest in the station appear clearly and are thus simply stated, the nature of the property involved was such that a number of things had to be done and certain official actions had to be taken in order to effectually carry out the sale agreed upon. A mere direct transfer to the purchasing broadcasting company of an interest in a property that was actually a department of the Seed Company would not have afforded an appropriate form for the independent general broadcasting business which the parties to the sale intended to carry on. Accordingly, a contract between the Seed Company and Central and another between three of the principal stockholders of the Seed Company and Central were drawn up and executed on October 17, 1939. These contracts provided for a new corporation to be organized and for the transfer to it of all the property and assets of radio station K M A in exchange for 1,000 shares of the capital stock of the new corporation. The Central Company agreed to pay $75,000 for 250 shares of such capital stock to be delivered immediately after the radio station property was turned over to the new corporation. Central further agreed to pay in to the treasury of the new corporation the sum of $25,000 as a contribution to working capital and also agreed to procure new business for it to the amount of not less than $30,000 gross per year. There was a further provision against selling the stock by either party without first offering it on the same terms to the other party and the stock certificates were to have plainly endorsed on their face: "The shares represented by this certificate are subject to the terms and conditions of a certain agreement dated October 17, 1939, between May Seed and Nursery Company as First Party and Central Broadcasting Company as Second Party, wherein certain provisions with reference to the disposition of said shares are set forth. A copy of said agreement is on file in the office of the secretary of this Corporation." It was also agreed that: "The Articles of Incorporation of said new corporation shall provide for cumulative voting in the election of

directors in such manner that the owners of twenty-five percent of the capital stock of said corporation shall be assured of the right to control the election of two directors out of a total of eight."

Within a month after the execution of the contracts of October 17, 1939, and on December 7, 1939, the taxpayer corporation was organized by the three individuals who were the principal stockholders of the Seed Company and each of them subscribed for and paid to the taxpayer $100 for one share of its no par value common stock. Upon coming into existence the new corporation (the taxpayer) and the Seed Company entered into their contract on December 22, 1939, in effect confirming the contract of October 17th and agreeing that the radio station property and license should be transferred to the new corporation for the issuance of 997 shares of its stock. The issuance of the stock was to be subject to the approval of the Executive Council of the State of Iowa and the transfer of the broadcasting license was to be subject to the approval of the Federal Communications Commission. On the same date of December 22, 1939, the three incorporators entered into agreement with the taxpayer that they would contribute $25,000 to the assets for working capital and that the money should be placed in escrow with a bank to be held until the transfer of the K M A property for the taxpayer's stock was made. That payment into the escrow was made on the same date of December 22, 1939, upon the understanding that the amount would be returned to the incorporators as soon as the Central Company made its agreed upon contribution of $25,000 to the taxpayer's capital.

On December 26, 1939, the Executive Council, State of Iowa, authorized the taxpayer to issue 997 shares of its capital stock for the broadcasting station. But delays were encountered in obtaining approval of the sale of the one-fourth interest and the transfer and renewal of license from the Federal Communications Commission. The Seed Company took the first steps to that end and filed its application on December 29, 1939, but through no lack of diligence the matter was not finally ap-

proved and the license granted by the Commission until August, 1941. On July 2, 1940, the uncertainty as to what the Commission was going to do was so far dispelled that the Central Company went ahead and paid over its $75,000 to the Seed Company, made its $25,000 contribution to capital of the taxpayer and received the 250 shares or one-quarter of the capital stock. On the same date the taxpayer's directors authorized the return to the incorporators of the $25,000 that had been put in escrow by them. Altogether about nine months elapsed between the execution of the contracts for the sale of the interest in the radio station and the consummation of the transaction. But except for that unanticipated and unavoidable delay the agreement to sell and the agreement to buy one-fourth interest in the station for $100,000 evidenced by the written contracts of October 17, 1939, were carried out in exact compliance with the contract terms. Those terms called for a vesting of $400,000 worth of property in the taxpayer corporation and division of the stock ownership in the proportion of three to one. Whatever view must be taken taxwise, the evidence shows beyond doubt that as an actual fact the corporation did become vested with and used in the operation of the business from which it earned its income, property that had the fair market value of $400,000 claimed by it. There was no witness to the contrary and we think no circumstance justified a contrary conclusion.

The conclusion of the Commissioner and the affirming conclusion of the trial court that the value was no more than $100,524.39 could only have been rested on the bookkeeping entries of the Seed Company. As those entries did not include the intangible element which was the principal element of the market value of the radio station, the conclusion was plainly erroneous.

It is equally clear that the transfer of the assets to the corporation and the issuance of the corporate stock were merely steps taken pursuant to and in accordance with the sale agreement of October 17, 1939. There was no evidence that the Seed Company had any intention or interest

to merely effect a transformation of its radio station property into a corporate stock holding. The sole transaction of substance between the parties that had anything to do with possible gain or loss to either of them was the sale of the interest for $100,000—the divesting of the Seed Company's "control" as defined by the statute and conferring a substantial ownership and voice in the operation on the purchasing Central Company.

That was the transaction the parties negotiated about and consummated and the particular steps taken were agreed upon and plainly appropriate to accomplish it.

The contention that there was a tax-free exchange, on account of which the taxpayer must pay excess profits taxes entirely out of proportion to the market value of its assets used to produce income, proceeds from the attempt to break up the substantial transaction, which was the sale, into elements which were in fact merely procedural steps in the transaction. The contention implies that the Seed Company transferred its radio station property to the taxpayer and received the capital stock therefor as one transaction, and then sold 250 shares of the stock to the Central Corporation as another transaction so as to make section 112(b) (5) applicable to the computation of the corporation's excess profits tax.

But we think that view of the transaction, leading as it does to distorted and unjust excess profits tax, is erroneous. Decision should be controlled by the principles declared and applied by the Court of Appeals of the 10th Circuit, in Tulsa Tribune Co. v. Commissioner, 58 F.2d 937, 940. In that case, as in this one, the major part of the value of the taxpayer's assets, namely, its newspaper property, was in intangibles (lists of customers, advertisers, etc.). It appeared that one Jones and persons associated with him had decided to buy the Tulsa Democrat, published at Tulsa, Oklahoma, and pursuant to the understanding Jones bought the property from its owner for $300,000 cash and paid for it. The procedure for consummating the transaction was like that followed in this case, in that pursuant to the purchase agreement,

a new corporation was organized and the newspaper property turned over to it. Its stock of the par value of $300,000 was distributed among Jones and his associates in the ratio they had agreed on. The auditor of the company set up its assets on the corporation's books on the basis of $140,000 to plant and equipment and $160,000 to circulation.

In the controversy over income and excess profits taxes it was contended for the government, as it is here, that there was more than one transaction; that the sale to Jones was one transaction and the transfer of the property to the corporation for the corporation's stock was a second and distinct transaction. But the court held that the attempt so to break the one real transaction up into two transactions was unfair. The court said:

"There seems to be no substantial justification under all the circumstances to arbitrarily divide the matter into two transactions as was done by the Board, which necessarily amounted to a finding from the evidence that Jones bought the paper for himself and then sold it to the corporation in consideration of the issuance of its capital stock, the net result of which is to penalize the petitioner in the matter of taxes assessed against it."

The court's holding required the tax involved in the case to be assessed as though the corporation had received the full market value of the assets for its capital stock.

The tax statute involved in the case was not identical with that here involved nor were the facts exactly analogous. But there was an essentially similar problem. It is common practice to include a new incorporation in a sale transaction and there is certainly nothing about it to call for penalizing. The decision in the Tulsa Tribune case has been frequently considered in the Tenth and other circuits. It has been distinguished in some cases, but not denied authority.

In the present case, the stock issue of the new corporation was directly tied to the sale contract of October 17th by the express provision of that contract that the

new corporation's stock certificates should show on their face that they were subject to the contract's terms and conditions and that the shares could not be transferred contrary to such terms. The contract by its terms provided for the consummation of the entire transaction immediately after the transfer of the assets to the new corporation, and but for the delay before the Federal Commission the several steps would undoubtedly have been concluded simultaneously. That unanticipated and unavoidable delay did not in any wise change the substance of the transaction. It remained simply a sale of a one-fourth interest in a property owned by the Seed Company to the Central Company for $100,000 cash in a way that assured the Central Company a substantial ownership of its interest and a voice in the control of the property and left the Seed Company less than 80% of such control. There is the same reason here to refuse to split that transaction up in arriving at the excess profits tax that there was in the Tulsa Tribune case. It is as unfair to say here that the Seed Company sold its radio property to the new corporation for the stock and then sold the stock to the Central Company as it was in that case to say that Jones sold the Democrat to the new corporation for its stock and then sold the stock to his associates. In both cases the organization of a corporation and making use of that form to effectuate an agreed upon sale for cash were merely incidental steps of a single transaction. There was not a tax free reorganization.

This necessity of refusing to break up a unitary transaction into separate transactions so as to result in a distorted and unfair tax has been recognized in many cases. Prairie Oil & Gas Co. v. Motter, 10 Cir., 66 F.2d 309; West Texas Refining Co. v. Commissioner, 10 Cir., 68 F.2d 77; Starr v. Commissioner, 2 Cir., 82 F.2d 964. In the latest case called to our attention, Bar-

ker v. United States, 9 Cir., 200 F.2d 223, the court declared the law generally:

"But each step in an entire transaction cannot be treated separately for income tax purposes. Halliburton v. C. I. R., 9 Cir., 1935, 78 F.2d 265. Where, as here, the parties to a transaction formulated a plan which contemplated several steps to accomplish the end result, and bound themselves by contract to carry out the plan, the actions taken constitute a single transaction."

In the case at bar the government pointed out and the trial court found that the book value of K M A as carried on the Seed Company's books was used in a number of ways before this controversy over excess profits taxes arose. That value was reported to the Executive Council, State of Iowa; to the Federal Communications Commission, and also to the Internal Revenue Collector. But there was no fraud or concealment by any of the parties nor was there anything unusual or deceptive in the way the Seed Company carried K M A on its books. The issue in this case was: What was the true amount of excess profits tax that was lawfully due and collectible from the taxpayer?

There was no estoppel pleaded against the taxpayer to prevent it from recovering its over-payment of excess profits taxes which the proof establishes that it made for each of the years 1943 through 1945.

The judgment denying recovery for such excess payments is therefore held to be erroneous and is reversed. The case is remanded with direction to award recovery for the amounts paid by the taxpayer for excess profits taxes in each of the three years in excess of the amounts lawfully owing for such taxes computed on the basis of the true market value of the assets in 1940, to-wit: $400,000. Interest to be added as provided by law.

Reversed and remanded with direction.