DANIEL D. PALMER AND AGNES H. PALMER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2557–71.   Filed August 27, 1974.

*Bernard J. Long, Jr.,* and *James A. Treanor III,* for the petitioners.

*Robert D. Grossman, Jr.,* and *Ava D. Poe,* for the respondent.

SIMPSON, *Judge:* The respondent determined a deficiency of $178,309.72 in the Federal income tax of the petitioners for the year 1966. Two issues are presented for decision. The first is whether in substance, as well as in form, a contribution of stock by the petitioners preceded the redemption of such stock, when the redemption took place the very next day. In the event we find that the contribution, in substance, preceded the redemption, we must determine whether the fair market value of the stock was less than claimed by the petitioners in their return.

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioners, Daniel D. Palmer and Agnes H. Palmer, are husband and wife, who maintained their residence in Davenport, Iowa, at the time their petition was filed in this case. They filed their joint Federal income tax return for the year 1966 with the district director of internal revenue, Des Moines, Iowa. Dr. Daniel D. Palmer will be referred to as the petitioner.

The petitioner's grandfather, Daniel David Palmer, was the creator and founder of what is now the nonmedical profession of chiropractic. In 1895, he established the first school of chiropractic in Davenport, Iowa, and was its owner and president until his death in 1913. In about 1906, the school was incorporated under Iowa law as a corporation operated for profit, and in 1947, its corporate charter was renewed for a perpetual term.

In 1961, the school changed its name from "The Palmer School of Chiropractic" to "Palmer College of Chiropractic." The Palmer College of Chiropractic as a corporate entity was empowered to, and actually did, engage in the sale, leasing, and ownership of real estate. It will be referred to as the corporation, as will its predecessor corporation, the Palmer School of Chiropractic. The educational facilities operated by the corporation will be referred to as the college.

Upon the death of the petitioner's grandfather, the petitioner's father, Dr. Bartlett Joshua (B.J.) Palmer, succeeded to the presidency of the college and the corporation. On November 7, 1959, an agreement

between the corporation and Dr. B. J. Palmer was executed. That agreement granted cross-options to his estate (the estate) and the corporation—the estate could require that the corporation purchase all its stock in the corporation, and the corporation could require that the estate sell all of such stock to it. The purchase price for such sale was to be the book value of the shares as of the last day of the month preceding the month in which Dr. B. J. Palmer died.

The petitioner's father died in May 1961, and the relationships which developed between the petitioner and the executors of the estate were marked by disagreement, hostility, and ill will.

A recitation in the will of Dr. B. J. Palmer stated that he and his wife had amply endowed their son during their lifetimes, and therefore, no provision was made for the petitioner. As a result, the petitioner brought a legal action against the executors and trustees to invalidate his father's will. Judgment was entered for the estate, an appeal was taken, and the Supreme Court of Iowa affirmed. *Palmer* v. *Evans*, 255 Iowa 1176, 124 N.W. 2d 856 (1963).

Another area of controversy involved the cross-option agreement between the corporation and the estate. By letter dated July 20, 1961, the executors of the estate notified the corporation that it desired to exercise its option and require redemption of the 649.01 shares of the corporation stock owned by the estate. The book value of such stock as of April 30, 1961, the last day of the month preceding the death of the petitioner's father, was $286.35 per share. The petitioner objected to the redemption and thought the terms of payment called for in the cross-option agreement were too costly. Eventually, after final judgment had been entered in the litigation between the estate and the petitioner concerning the validity of the will, a negotiated settlement was agreed upon. Such settlement, which was embodied in an agreement dated July 24, 1964, resolved not only the controversy surrounding the redemption agreement, but also resolved other controversies outstanding at that time, and not relevant to the issue herein. Under the terms of the settlement agreement, the shares of the corporation were redeemed from the estate at the 1964 book value of $264.74 per share, rather than at the date-of-death value. Such amount was paid for the estate's shares without interest. The negotiations which led to the final settlement were hostile, vigorously contested, and arm's length.

As early as before the death of his father, the petitioner contemplated the possibility of making the college into a nonprofit institution. It was felt that alumni financial support in the form of gifts and bequests was being withheld principally because would-be donors were reluctant to contribute and thereby enrich the holdings of the Palmer family. In addition, it was felt that contributions were not made because they were not deductible for purposes of the Federal income

and estate taxes, and that participation in certain Federal funding programs was denied the college because it was not a nonprofit institution. Moreover, because the corporation was operated for profit, graduates of the college encountered difficulty obtaining licenses to practice chiropractic in at least one State. Accordingly, the petitioner caused the Palmer College Foundation (the foundation) to be organized in 1964 as a corporation not for pecuniary profit.

In general, the foundation was organized to engage in religious, charitable, educational, and scientific activities. Specifically, it was intended and empowered to take over ownership of the college from the corporation. In addition, the foundation was empowered to accept gifts, to make loans to students, and to award scholarships, research grants, and prizes for meritorious essays.

By letter dated January 13, 1965, IRS determined that the foundation qualified as a tax-exempt organization pursuant to section 501 (c) (3) of the Internal Revenue Code of 1954.[1]

The bylaws of the foundation provided for two distinct series of certificates to be issued to the trustees of the foundation. The first group of certificates, series A, were transferable only by gift, bequest, or devise, and were limited in number to nine. The bylaws provided that six such certificates were to be issued to the petitioner, and that the remaining three certificates were to be issued to Mrs. Palmer. The second group of certificates, series B, were not transferable and were limited in number to two certificates. The bylaws of the foundation provided that such certificates were to be held only by the treasurer of the corporation. The bylaws also provided that each certificate, regardless of its classification, was entitled to one vote for each vacancy on the board of directors, and that at a meeting of the trustees, the presence of the trustees entitled to vote a majority of the total votes constituted a quorum.

During the entire year in issue, 1966, the certificates were held as specified in the bylaws. As a result, the petitioner controlled the foundation. Not only was he the controlling trustee by virtue of having personal control over the majority of the certificates, but he was also its president and a director. Moreover, Mrs. Palmer was a trustee and director, and the other directors and officers of the foundation were personally chosen by the petitioner and were the same individuals as the officers and directors of the corporation.

In 1966, the corporation had outstanding 2,896.97 shares of common stock, par value $100, prior to September 1 of that year. Of those shares, 2,078.97 shares were owned by a trust (the trust) created under

---

[1] All statutory references are to the Internal Revenue Code of 1954, unless otherwise indicated.

the last will and testament (the will) of Mabel H. Palmer, the petitioner's mother, and the remaining 818 shares were owned by the petitioner. Under the terms of the will, the petitioner was trustee and income beneficiary of the trust, Mrs. Agnes H. Palmer was a contingent income beneficiary, and the three minor daughters of the petitioner were the ultimate remaindermen.

The petitioner exercised effective control of the corporation and the college throughout 1966. Prior to September 1, 1966, he was president of the college, president of the corporation, and a member of the latter's board of directors. Of the three other officers of the corporation at that time, two were close friends and longtime associates of the petitioner, and of such three officers, two were directors.

The petitioner, as president of the corporation, was actively engaged in the operations of the college. One of his major concerns was the continuation of the pure essence of chiropractic as taught by his grandfather and father, and the petitioner had the final say with respect to curriculum selection, employment and assignment of the faculty, and other staff and budgetary considerations. In addition, he was involved in fund-raising activities among alumni.

The business offices of the corporation and the foundation were located in the same building at all times relevant to the proceedings herein, and the petitioner, as director and president of the corporation and as director, president, and trustee of the foundation, maintained a single office in the administration building on the college campus.

The petitioner engaged counsel to devise a plan that would accomplish the transfer of the college from the corporation to the foundation, that would enable the petitioner to maintain his control over the direction and operation of the college, and that would yield the most favorable tax consequences. In connection with the development of such plan, a local real estate appraiser was engaged to value the land and improvements owned by the corporation. His conclusions on valuation were summarized in a covering letter dated September 14, 1965, which was addressed to the treasurer of the corporation and attached to his appraisal report. In that letter, he determined the fair market value of the college assets appraised by him was $2 million.

Next, a national accounting firm was employed, in part, for the purpose of making a pro forma allocation of corporate assets between those relating to the educational facilities to be transferred to the foundation and the other assets to be retained by the corporation. Using information provided by the treasurer of the corporation, the accounting firm allocated $776,744.85 to the corporation and $2,468,-827.35 to the foundation.

Based upon the appraisal, counsel for the petitioner advised that the assets attributable to the college were valued at $2 million, and

that such assets comprised approximately 80 percent of the total assets of the corporation, which were valued at $2,500,000. In addition, counsel advised that the 2,078.97 shares of the corporation stock owned by the trust represented 71.76 percent of the corporate assets and that the petitioner's shares represented the remaining 28.24 percent of such assets. Finally, counsel advised the petitioner that if the foundation were to receive the college assets by virtue of a redemption of stock, it would be necessary for the foundation to relinquish $2 million worth of stock in the redemption.

On August 31, 1966, the foundation acquired the shares of stock in the corporation held by the trust in return for a promissory note in the face amount of $1,794,000. The purchase price, which amounted to $863 per share, was determined on the basis of the aforementioned appraisal of the real estate owned by the corporation, an estimate concerning the value of the name and goodwill of the college, and the book value of its other assets and liabilities. Under the terms of the promissory note, the principal was payable in annual installments of $51,257 over a 35-year period, with the final payment being somewhat larger in amount. Simple interest at the rate of 4 percent per annum was payable upon each installment. No downpayment was required.

Prior to the purchase of the stock from the trust, the foundation did not have assets with which to pay the promissory note. In its application for exemption in the year 1964, the foundation listed its current assets as $4,246.90, and for the period ending December 31, 1965, it reported total assets of $37,087.50. It was intended that the foundation would obtain the funds necessary for payment of the installment obligations primarily from the operations of the college.

Also on August 31, 1966, the petitioner transferred 238 shares of stock of the corporation to the foundation. Thereafter, the foundation owned 2,316.97 shares, which represented 79.979 percent of the total issued and outstanding shares of the corporation. The parties have treated such amount as 80 percent, and so shall we.

At the meeting in which the board of directors and trustees of the foundation authorized the purchase of stock from the trust, it was resolved that the foundation, as owner of in excess of 70 percent of the stock of the corporation, would convene a joint directors and stockholders meeting, for the purpose of considering the redemption of the stock held by the foundation. In addition, the board of directors and the trustees were authorized to effectuate the redemption.

At 10 o'clock in the morning of the next day, September 1, 1966, the board of directors and shareholders of the corporation met and approved an agreement whereby the shares of the corporation stock held by the foundation were to be redeemed in return for the operating assets of the college. At 2 o'clock in the afternoon of the same day, the

board of directors and trustees of the foundation met specially to consider and approve that redemption. All these meetings took place in the administration building of the college.

After the performance of the redemption agreement of September 1, 1966, all of the operating assets of the college were owned directly by the foundation, and the primary business of the corporation became the ownership, leasing, and sale of real property. After such transfer, the petitioner exercised the same degree of control over the direction and administration of the college as he did when the college was operated by the corporation.

In his return for the year 1966, the petitioner claimed a charitable deduction of $52,640.72 attributable to the transfer of 238 shares of stock of the corporation to the foundation. The stock was treated as having a value of $863 per share. In his notice of deficiency, the respondent determined that the contribution of stock followed by its redemption was in substance a distribution to the petitioner essentially equivalent to a dividend, and determined that the amount of such distribution was $205,394, the value of the assets represented by such stock. He also determined that the petitioner's charitable contribution deduction should be increased by $62,706.40 as a result of the increase in his gross income. In an amended answer, the respondent determined that the entire deduction for the charitable contribution should be disallowed.

OPINION

The respondent has challenged the gift of stock to the foundation. He claims that the ultimate objective of the petitioner was to bring about a transfer of assets to the foundation and that the gift of stock was meaningless. In support of that contention, the respondent argues that the gift was illusory, incomplete, and transitory, and that in any event, it should be disregarded as an intermediary step of a single, integrated transaction. If not disregarded, the gift by the petitioner was, according to the respondent, an anticipatory assignment of the proceeds of the redemption which would otherwise be taxable to the petitioner as a distribution under sections 302 and 301. Finally, the respondent challenged the deduction on the grounds that the stock was worth a great deal less than that claimed by the petitioner.

Section 170 allows a deduction for any charitable contribution made during the taxable year. If we find that in fact the petitioner did make a contribution of the 238 shares in 1966, he is entitled to deduct the fair market value of such contribution, subject to the percentage limitations on such a deduction. However, if we were to find that the petitioner arranged for a redemption of such shares and then contributed the assets so acquired to the foundation, the tax consequences would be

significantly different. Under section 302, the amounts distributed to a shareholder in redemption of his stock may be taxed to him as a dividend under section 301 or may be treated as the proceeds of the sale of a capital asset. In either event, the petitioner would most likely be taxable on some income as a result of the redemption, but he would be allowed a charitable contribution deduction with respect to the value of the assets contributed to the foundation. Thus, the heart of the controversy is whether the petitioner is taxable on any income as a result of the series of transactions which took place on August 31 and September 1, 1966.

In *Humacid Co.*, 42 T.C. 894, 913 (1964), we said:

The law with respect to gifts of appreciated property is well established. A gift of appreciated property does not result in income to the donor so long as he gives the property away absolutely and parts with title thereto before the property gives rise to income by way of a sale. * * * [2]

*Carrington* v. *Commissioner*, 476 F. 2d 704 (C.A. 5, 1973), affirming a Memorandum Opinion of this Court; *Behrend* v. *United States*, an unreported case (C.A. 4, 1972, 31 A.F.T.R. 2d 73-406, 73-1 U.S.T.C. par. 9123); *DeWitt* v. *United States*, 503 F. 2d 1406 (Ct. Cl. 1974); *Sheppard* v. *United States*, 361 F. 2d 972 (Ct. Cl. 1966); *Winton* v. *Kelm*, 122 F. Supp. 649 (D. Minn. 1954); *Apt* v. *Birmingham*, 89 F. Supp. 361 (N.D. Iowa 1950).[3] However, the respondent contended that such principles of law are not applicable in this case and presented a variety of arguments in support of his position. He urged that tax consequences are determined on the basis of the substance of the transaction, and not its form, and that because the petitioner conceived the plan for the transfer of the college to the foundation and controlled all parties to that transfer, there was, in substance, no gift of stock to the foundation. He invoked the step-transaction doctrine and suggested that since the various steps toward the accomplishment of the petitioner's objective were interdependent, they should be ignored for tax purposes. Finally, he asserted that the petitioner had the power to bring about a redemption of his stock and that, therefore, there was in effect merely an assignment of income by him.

The principles urged by the respondent are sound and well established in our tax law. The incidence of taxation depends upon the substance of the transaction and not mere formalism. *Commissioner* v. *Court Holding Co.*, 324 U.S. 331, 334 (1945). Taxation is not so much concerned with refinements of title as it is with actual command

---

[2] In the Tax Reform Act of 1969, Congress dealt with contributions of income and appreciated property, and by the enactment of sec. 170(e), it modified the law applicable to gifts made after 1969. See sec. 170(e) and sec. 1.170A–4, Income Tax Regs.

[3] See also *Robert L. Fox*, 37 P.-H. Memo. T.C. par. 68,205, 27 T.C.M. 1001 (1968); but see *Russell E. Phelon*, 35 P.-H. Memo. T.C. par. 66,199, 25 T.C.M. 1024 (1966).

over the property. *Corliss* v. *Bowers*, 281 U.S. 376, 378 (1930); see also *Commissioner* v. *P. G. Lake, Inc.*, 356 U.S. 260 (1958); *Helvering* v. *Clifford*, 309 U.S. 331 (1940); *Griffiths* v. *Commissioner*, 308 U.S. 355 (1939); *Sachs* v. *Commissioner*, 277 F. 2d 879, 882–883 (C.A. 8, 1960), affirming 32 T.C. 815 (1959). Under such cases, a mere transfer in form, without substance, may be disregarded for tax purposes. *Commissioner* v. *P. G. Lake, Inc., supra; Commissioner* v. *Court Holding Co., supra; Commissioner* v. *Sunnen*, 333 U.S. 591 (1948); *Helvering* v. *Clifford, supra; Corliss* v. *Bowers, supra; Richardson* v. *Smith*, 102 F. 2d 697 (C.A. 2, 1939); *Howard Cook*, 5 T.C. 908 (1945); *J. L. McInerney*, 29 B.T.A. 1 (1933), affd. 82 F. 2d 665 (C.A. 6, 1936).

As a corollary to the general proposition of those cases, it has been stated by the Supreme Court that "A given result at the end of a straight path is not made a different result because reached by following a devious path." *Minnesota Tea Co.* v. *Helvering*, 302 U.S. 609, 613 (1938). Accordingly, where a taxpayer has embarked on a series of transactions that are in substance a single, unitary, or indivisible transaction, the courts have disregarded the intermediary steps and have given credence only to the completed transaction. E.g., *Redwing Carriers, Inc.* v. *Tomlinson*, 399 F. 2d 652, 654 (C.A. 5, 1968); *May Broadcasting Co.* v. *United States*, 200 F. 2d 852 (C.A. 8, 1953); *Whitney Corporation* v. *Commissioner*, 105 F. 2d 438 (C.A. 8, 1939), affirming 38 B.T.A. 224 (1938); *Commissioner* v. *Ashland Oil & R. Co.*, 99 F. 2d 588 (C.A. 6, 1938), reversing sub nom. *Swiss Oil Corporation*, 32 B.T.A. 777 (1935), certiorari denied 306 U.S. 661 (1939); *James Kuper*, 61 T.C. 624 (1974); *Kimbell-Diamond Milling Co.*, 14 T.C. 74 (1950), affirmed per curiam 187 F. 2d 718 (C.A. 5, 1951), certiorari denied 342 U.S. 827 (1951). Transactions that are challenged as intermediary steps of an integrated transaction are disregarded only when found to be so interdependent that the legal relations created by one transaction would have been fruitless without the completion of the series. *American Bantam Car Co.*, 11 T.C. 397, 405 (1948), affd. 177 F. 2d 513 (C.A. 3, 1949), certiorari denied 339 U.S. 920 (1950); see *Scientific Instrument Co.*, 17 T.C. 1253 (1952), affirmed per curiam 202 F. 2d 155 (C.A. 6, 1953).

As a general rule, a taxpayer cannot insulate himself from taxation merely by assigning a right to income to another. *Commissioner* v. *Sunnen, supra; Helvering* v. *Horst*, 311 U.S. 112 (1940); *Corliss* v. *Bowers, supra; Lucas* v. *Earl*, 281 U.S. 111 (1930). If the putative assignor performs services (*Lucas* v. *Earl*), retains the property (*Helvering* v. *Horst*), or retains the control over the use and enjoyment of the income (*Commissioner* v. *Sunnen; Corliss* v. *Bowers*), the liability for the tax remains on his shoulders. However, if the entire interest in the property is transferred and the assignor retains no incidence of either

direct or indirect control, then the tax on the income rests on the assignee. *Blair* v. *Commissioner*, 300 U.S. 5 (1937) ; *Carrington* v. *Commissioner, supra; Behrend* v. *United States, supra; DeWitt* v. *United States, supra; Humacid Co.*, 42 T.C. 894 (1964) ; *Winton* v. *Kelm, supra; Apt* v. *Birmingham, supra.*

Despite the undoubted validity of those doctrines, we find them to be inapplicable in this case. Similar attacks have been presented by the respondent in a variety of cases involving gifts of stock followed by its redemption, and the attacks have generally been rejected by the courts. *Grove* v. *Commissioner*, 490 F. 2d 241 (C.A. 2, 1973), affirming a Memorandum Opinion of this Court; *Carrington* v. *Commissioner*, 476 F. 2d 704 (C.A. 5, 1973) ; *Behrend* v. *United States*, an unreported case (C.A. 4, 1972, 31 A.F.T.R. 2d 73–406, 73–1 U.S.T.C. par. 9123) ; *DeWitt* v. *United States*, 503 F. 2d 1406 (Ct. Cl. 1974) ; *Sheppard* v. *United States*, 361 F. 2d 972 (Ct. Cl. 1966) ; *Winton* v. *Kelm*, 122 F. Supp. 649 (D. Minn. 1954) ; *Apt* v. *Birmingham*, 89 F. Supp. 361 (N.D. Iowa 1950) ; see *Humacid Co., supra.* The petitioner wished to have the college become a nonprofit organization, and there were two paths which he could have taken—he could have had the stock redeemed and then made a contribution of the assets, or he could have contributed the stock and let the donee arrange for the redemption. The tax consequences to the donor turn on which path he chooses, and so long as there is substance to what he does, there is no requirement that he choose the more expensive way. *Gregory* v. *Helvering*, 293 U.S. 465 (1935). He arranged for the transfer to precede the redemption, and there is no reason for us to conclude that such a sequence of events lacked any more substance than for the redemption to precede the transfer, as suggested by the respondent. *Carrington* v. *Commissioner*, 476 F. 2d at 706. The only question is whether he really made a gift, thereby transferring ownership of the stock prior to the redemption.

Even though the donor anticipated or was aware that the redemption was imminent, the presence of an actual gift and the absence of an obligation to have the stock redeemed have been sufficient to give such gifts independent significance. *Carrington* v. *Commissioner, supra; DeWitt* v. *United States, supra; Sheppard* v. *United States, supra.* It is true that the petitioner controlled the foundation. However, the foundation was a charitable organization that was organized for certain specific purposes. Under Iowa law, the petitioner was subject to the responsibilities and duties of a fiduciary when he acted as director and trustee of the foundation (*Schildberg Rock Products Co.* v. *Brooks*, 258 Iowa 759, 140 N.W. 2d 132, 136–137 (1966) ; *Des Moines Bank & Trust Co.* v. *George M. Bechtel & Co.*, 243 Iowa 1007, 51 N.W. 2d 174, 215–217 (1952)), and there is nothing in the record to indicate that he exercised command over the use and enjoyment of prop-

erty of the foundation in violation of his fiduciary duty. There has been no allegation or evidence that the foundation was a sham. In these circumstances, it appears clear that the foundation was not an alter ego of the petitioner, and in fact it had dominion and control over the shares of stock received by gift from the petitioner, notwithstanding the fact that the petitioner was the controlling trustee. *United States* v. *Morss*, 159 F. 2d 142 (C.A. 1, 1947); *Theodore D. Stern*, 15 T.C. 521 (1950); *Crosby* v. *United States*, an unreported case (S.D. Miss. 1973, 31 A.F.T.R. 2d 73-1191, 73-1 U.S.T.C. par. 9399); *Winton* v. *Kelm, supra;* see *William Waller*, 39 T.C. 665 (1963).

Although, after the gift and the redemption, the petitioner retained power and control over the curriculum and policies of the college, such control was not tantamount to the control and dominion of an owner over the use and enjoyment of property. His control of the affairs of the college was akin to the manager of a business, but he had no right to share in its profits. In an analogous situation involving a gift to a family member of a partnership interest to be held in trust, retention by the donor of the control of the business was not sufficient reason, alone, to restructure the gift and the resulting interest in the profits of the partnership. *Kuney* v. *United States*, 448 F. 2d 22 (C.A. 9, 1971); *Theodore D. Stern, supra; Edward D. Sultan*, 18 T.C. 715 (1952), affirmed per curiam 210 F. 2d 652 (C.A. 9, 1954); compare *Commissioner* v. *Sunnen*, 333 U.S. 591 (1948). In *Behrend* v. *United States, supra*, the donor's control over the charity and the corporation was not sufficient to cause the restructure of the gift and the redemption of the stock there in issue. There is no discernible difference between the facts of that case and those before us.

In *Hudspeth* v. *United States*, 471 F. 2d 275 (C.A. 8, 1972), the taxpayer owned 80 percent of the stock in a closely held, family-owned corporation. In April 1964, the directors adopted and the shareholders ratified a plan of complete liquidation. Before the corporation filed articles of dissolution with the proper State authority and before the assets were distributed to the shareholders, the taxpayer donated 67 shares, or less than 7 percent, of the stock to a charity. Regardless of that transfer, the court held that in substance, the taxpayer transferred the proceeds of dissolution. Under the court's reasoning, it was significant that the gift was made after the vote for liquidation. That vote signified the taxpayer's intent to convert the corporation into the essential elements of his investment. Moreover, the donee was powerless to reverse or have revoked the decision to liquidate. See *John P. Kinsey*, 58 T.C. 259 (1972), affd. 477 F. 2d 1058 (C.A. 2, 1973); *Howard Cook*, 5 T.C. 908 (1945). The court considered that those facts made the case distinguishable from cases in which either no plan had been adopted at the time of the gift even though liquidation was anticipated

and planned (e.g., *Winton* v. *Kelm*, *supra; Apt* v. *Birmingham*, *supra*), or the donee was given sufficient interest to reverse the decision to liquidate (e.g., *W. B. Rushing*, 52 T.C. 888 (1969), aff'd. 441 F. 2d 593 (C.A. 5, 1971)).

In our opinion, the facts herein are more akin to those in *W. B. Rushing*, *supra*, *Winton* v. *Kelm*, *supra*, and *Apt* v. *Birmingham*, *supra*, and are distinguishable from those in *Hudspeth* v. *United States*, *supra*, *John P. Kinsey*, *supra*, and *Howard Cook*, *supra*. When the foundation received the gift of stock from the petitioner, no vote for the redemption had yet been taken. Although we recognize that the vote was anticipated, nonetheless, under the *Hudspeth* reasoning, that expectation is not enough. We have found that the foundation was not a sham, was not an alter ego of the petitioner, and that it received his entire interest in the 238 shares of the corporation stock. On the same day, it acquired enough shares of stock from the trust to hold in the aggregate 80 percent of the outstanding shares of the corporation. Thereafter, the foundation voted for the redemption. It did so because the redemption was in its interest. At the time of the gift, that vote had not yet been taken, and by the afternoon of August 31, 1966, the foundation had the voting power to prevent the redemption, if it wished to do so. In these circumstances, at the time of the gift, the redemption had not proceeded far enough along for us to conclude that the foundation was powerless to reverse the plans of the petitioner. In light of the presence of an actual, valid gift and because the foundation was not a sham, we hold that the gift of stock was not in substance a gift of the proceeds of redemption.

The remaining issues involve the fair market value of the shares donated by the petitioner. Such issues were raised initially by the respondent in an amended answer. Under Rule 142 of the Tax Court Rules of Practice and Procedure, the respondent has the burden of proof. *Morris M. Messing*, 48 T.C. 502, 511 (1967).

The respondent contends that the fair market value of the shares donated did not exceed $310. He argues that the petitioner made his donation in expectation of the sale by the trust at an inflated price, that the two transactions were related, and that in light of what he contends is the fair market value, no contribution, as that term is used in section 170, was received by the foundation. In the alternative, he argues that because the gift and the sale were related, the foundation sustained a net economic detriment upon the conclusion of the transactions by virture of the inflated purchase price. Finally, he contends that the deduction should be limited to the actual fair market value, subject to the percentage limitations of section 170 not here in issue.

The respondent's arguments hinge on whether he has carried his burden of proving that the fair market value of the stock was less than

the amount originally claimed by the petitioner. In the absence of such proof, there is no basis to support any of his contentions.

With respect to contributions of property, section 1.170–1(c)(1) of the Income Tax Regulations provides, in pertinent part:

(c) * * * (1) *General rules.* If a contribution is made in property other than money, the amount of the deduction is determined by the fair market value of the property at the time of the contribution. The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. * * *

See also *O'Malley* v. *Ames*, 197 F. 2d 256 (C.A. 8, 1952); *Daniel S. McGuire*, 44 T.C. 801 (1965).

The respondent has chosen to rely on the testimony of one expert, a senior valuation engineer in the employ of the Internal Revenue Service. That expert determined the fair market value by reference to the sale of the stock from the estate of the petitioner's father to the corporation in 1964. Initially, he determined the price per share was $264.74. Next, he determined that the average net income of the corporation, after taxes, for the period 1961 through 1963 was $69,710, and that the average earnings per share outstanding was $19.66. The price/earnings ratio, therefore, amounted to 13.47 to 1.00 as of the date of that sale. From his calculations, he determined that on the same date, the price/earnings ratio for Standard & Poor's index of 425 industrial stocks was approximately 17.61 to 1.00 and that the price/earnings ratio of the corporation was 76.5 percent of the Standard & Poor's ratio. He then determined the approximate price/earnings ratio of Standard & Poor's index for August 31, 1966, multiplied that figure by 0.765, and applied the product to the average earnings of the corporation for the period 1963 through 1965. He thus arrived at a value of $310 per share. He used no other method to check his findings and had no independent knowledge of the corporation or the college.

The respondent claims reliance on the 1964 sale between the estate and the corporation is justified because the parties negotiated vigorously, dealt at arm's length, and had knowledge of all the relevant facts. However, the respondent overlooks the fact that the corporation was compelled to enter the transaction. That element of compulsion precludes a determination of value by reference to that sale.

Ordinarily, the price at which the same or similar property has changed hands is persuasive evidence of fair market value. *Grill* v. *United States*, 303 F. 2d 922, 927 (Ct. Cl. 1962); *Augustus E. Staley*, 41 B.T.A. 752, 769 (1940). Where the parties to the sale have dealt with each other at arm's length and the sale is within a reasonably close period of time to the valuation date, the price agreed upon is considered to have accurately reflected conditions in the market. How-

ever, not all sales accurately reflect market conditions. *Heiner* v. *Crosby*, 24 F. 2d 191 (C.A. 3, 1928); *Estate of Alexia DuPont Ortiz DeBie*, 56 T.C. 876 (1971); *Daniel S. McGuire, supra; Acme Mills, Inc.*, 6 B.T.A. 1065 (1927).

In *Acme Mills, Inc., supra*, the property at issue was sold by the trustee of the bankrupt's creditors 5 months prior to the valuation date. There was no indication that the negotiations preceding the sale were conducted in a manner other than at arm's length. Nonetheless, that sale did not establish the fair market value. The Court stated at 6 B.T.A. 1067:

While not, perhaps, under a strict compulsion to sell, the action of the trustees was impelled by a very decided pressure from creditors whom they represented to dispose of property which, under existing conditions, was to them a white elephant. *There was not an open market and willingness to sell, free of compulsion or necessity.* [Emphasis supplied.]

Turning to the facts before us, we observe that the negotiations between the estate and the corporation may have been vigorously contested, but the fact still remains that both parties were locked into the sale by virtue of the cross-options found in the agreement between the petitioner's father and the corporation. In 1961, the estate exercised its option to have the shares redeemed. Thereafter, the parties were forced to deal with each other. It is possible that no discernible market existed for such shares other than with the corporation. The attorney for the estate so testified at trial. Nonetheless, such fact only demonstrates that the estate was a willing seller; it does not demonstrate that the corporation was a willing buyer. Section 1.170–1(c)(1) of the regulations defines fair market value in terms of both a willing buyer and a willing seller. The transaction relied on by the respondent and his expert fails to shed light on the price a buyer would pay in the absence of compulsion.

Moreover, the price finally paid for the stock was not determined by the forces of the marketplace. The agreement between the petitioner's father and the corporation provided that the price should be based on the book value of the stock at the end of the month preceding his death, and although there were vigorous negotiations concerning the price to be paid for the stock, the price finally paid was in substantial conformity with the provisions of the agreement. The respondent contends that if the value of the stock had been substantially greater, the estate would not have been willing to sell for the agreed price, and the corporation would not have been so reluctant to pay that price. However, the existence of the agreement restricted the seller's opportunities to sell and placed the corporation in a strong bargaining position. For those reasons, we are not satisfied that the

price agreed upon by them reflects the price that would have been reached by parties bargaining freely in the marketplace.

The respondent contends that this situation is analogous to one in which a shareholder acquires stock from a corporation, subject to an option reserved by the corporation to repurchase that stock at a stated price. In such situation, the fair market value does not exceed the option price. *Estate of Albert L. Salt*, 17 T.C. 92 (1951). However, the respondent is mistaken in his analogy. That case merely held that the value of the stock subject to the option was determined by reference to the option price. Here, the stock to be valued was not subject to any option, and the price paid for the stock subject to the agreement between the petitioner's father and the corporation has no bearing on what a willing buyer would pay to a willing seller for the stock in the marketplace. Cf. *Jack I. LeVant*, 45 T.C. 185, 203–205 (1965), affirmed on this issue 376 F. 2d 434 (C.A. 7, 1967); *Edith G. Goldwasser*, 47 B.T.A. 445, 455–457 (1942), affirmed per curiam 142 F. 2d 556 (C.A. 2, 1944), certiorari denied 323 U.S. 765 (1944) (involving specific shares of "letter" stock).

The respondent has introduced no other evidence of value. In these circumstances, the respondent has failed to prove that the fair market value of the corporation stock as of August 31, 1966, was less than $863.

In their reply brief, the petitioners asked, for the first time, that we find that the value of the stock was $1,096 per share on the date it was given to the foundation. The petitioners have raised such issue too late. An issue raised for the first time in the reply brief cannot, in fairness to all parties, be considered. *Estate of Isabelle M. Sparling*, 60 T.C. 330, 349–350 (1973); *James G. Maxcy*, 59 T.C. 716, 728 (1973); *Kate Froman Trust*, 58 T.C. 512, 518–519 (1972). Although the respondent vigorously challenged the petitioners' evidence as to the value of the stock, he was not put on notice that they were going to claim that the value of such stock exceeded $863 per share. Since he was not given notice of that claim, he was deprived of any opportunity to present any objections with respect to it.

What is more, the petitioners have failed to establish that the value of the stock actually exceeded $863 per share. They have the burden of proving that the value exceeded that claimed on their return and relied on in the notice of deficiency. *Estate of Harry Schneider*, 29 T.C. 940, 956–957 (1958); cf. *Lovell & Hart, Inc.* v. *Commissioner*, 456 F. 2d 145 (C.A. 6, 1972), affirming per curiam a Memorandum Opinion of this Court. They called two experts who testified with respect to valuation. One expert dealt merely with the value of the land and improvements owned by the corporation. The other expert

had experience in acquiring proprietary educational institutions, and he testified as to the value of the college as a going business. His opinion as to the value of the stock was merely that it was worth at least $863 per share, but the petitioner's claim for a higher value of the stock is based on his determination of the value of the college.

The petitioners have offered no expert opinion that the value of the stock exceeded $863 per share. Although they offered evidence as to the value of the assets of the corporation, such evidence is ordinarily unconvincing as to the value of the stock of a corporation. *Weber* v. *Rasquin*, 101 F. 2d 62, 64 (C.A. 2, 1939) ; *Williams* v. *Commissioner*, 44 F. 2d 467, 470 (C.A. 8, 1930), affirming 15 BT.A. 227 (1929). Furthermore, the 238 shares donated by the petitioner were a minority interest, and ordinarily the value of a minority interest must be discounted. *Central Trust Co.* v. *United States*, 305 F. 2d 393, 405 (Ct. Cl. 1962) ; *George F. Collins, Jr.*, 46 T.C. 461, 476 (1966), affirmed on another issue 388 F. 2d 353 (C.A. 10, 1968), vacated and remanded per curiam on another issue 393 U.S. 215 (1968), reversed on another issue 412 F. 2d 211 (C.A. 10, 1969) ; *Bader* v. *United States*, 172 F. Supp. 833 (S.D. Ill. 1959). The expert gave no consideration to the fact that the 238 shares constituted a minority interest. The petitioners argued, for this purpose, that those shares were transferred as a part of a plan to acquire a controlling interest, but they have convinced us that for other purposes in this case, the acquisition of the shares contributed by the petitioner should be viewed as a separate and independent transaction. In the light of these circumstances, we believe that the petitioners have failed to carry their burden of proving that the value of the stock exceeded that value claimed on their return.

*Decision will be entered for the petitioners.*